The CITY OF AUSTIN et al.,
Appellants,

v.

Carol Marie COOKSEY et al., Appellees.

No. 5033.

Court of Civil Appeals of Texas,
Eastland.

Jan. 5, 1978.

Rehearing Denied Feb. 2, 1978.

Karen Parker, Asst. City Atty., Sam L. Jones, Jr., Asst. Atty. Gen., Jack W. Latson, Flahive & Ogden, Austin, Tex., for appellants.

Ronald D. Krist and Harvill E. Weller, Jr., Krist, Gunn & Weller, Houston, Tex., Clark, Thomas, Winters & Shapiro, Barry K. Bishop, Austin, Tex., for appellees.

WALTER, Justice.

We grant appellees' motion for rehearing and withdraw our opinion and judgment dated October 13, 1977 and the following opinion is rendered in lieu thereof.

This is a wrongful death case. Carol Marie Cooksey, Pamela Kay Cooksey, Kimberly Cooksey and Clara B. Cooksey, the widow, children and mother of Michael Cooksey, recovered a judgment against Hensel Phelps, Inc., the City of Austin and the State of Texas.

The State and the City have appealed. Hensel Phelps joined the Cookseys in asking that the judgment be affirmed.

Michael Cooksey was employed by Udo Haufler Excavating Company as a bulldozer front-end loader operator.

Plaintiffs alleged Hensel Phelps was the general contractor with the State on Interstate freeway in the proximity of 51st Street at its intersection with Interstate Highway 35 in Austin; at the time of Mr. Cooksey's death, he was working near a light pole that had been set by the City pursuant to plans and specifications proposed by the State or Hensel Phelps; the deceased was working in the vicinity of the pole and as it began to fall toward him, in his efforts to escape, he abandoned his bull-

dozer and it ran over him and killed him; the deceased was performing services pursuant to his employer's contract with Hensel Phelps "on premises owned, controlled or occupied by Hensel Phelps, Inc. Michael Cooksey, deceased, on the time and occasion in question, was what is known in law as an invitee of Hensel Phelps, Inc."

They allege thirteen specific acts of negligence against Hensel Phelps.

In addition to the same thirteen acts of negligence pleaded against Hensel Phelps, plaintiffs pleaded the City failed to operate its power company in accordance with the National Electric Safety Code.

In addition to the same thirteen acts of negligence pleaded against Hensel Phelps, plaintiffs pleaded the State was guilty of gross negligence. Plaintiffs also pleaded the State, in violation of Art. 6252–19, V.A. C.S., Sections 3 and 18(b), created and maintained a dangerous condition on its premises or right-of-way at the intersection of Interstate 35 and 53rd Street in Austin in the form of a power pole without proper supporting structure, near a proposed or developed excavation site. They alleged this was a dangerous condition on its premises and a special defect of which the State had an affirmative duty to warn the decedent. They alleged the State had actual knowledge of this condition and failed to remedy the danger.

Also, by pleading Section 3 of the Act, plaintiffs pleaded the death of Michael Cooksey was proximately caused by the negligence of the State from some condition or some use of tangible property, real or personal.

The Texas Tort Claims Act waives sovereign immunity for all governmental units in three general areas: "use of publicly owned automobiles, premise defects, and injuries arising out of conditions or use of property". Greenhill & Murto, Governmental Immunity, 49 Texas L.Rev. 462 (1971).

The jury found Hensel Phelps negligent (1) in failing to discover the dangerous condition, (2) in failing to give an "adequate warning" of the dangerous condition, and (3) in failing to correct the dangerous condition. The jury found each act of negligence to be a proximate cause.

The jury found the City negligent (1) in setting the pole in unstable terrain without adequate support, (2) in failing to discover the dangerous condition, (3) in failing to give an "adequate warning" of the dangerous condition, and (4) in failing to correct the dangerous condition. They found each act to be a proximate cause.

The jury found the State negligent (1) in setting the pole in unstable terrain without adequate support, (2) in failing to discover the dangerous condition, (3) in failing to give an "adequate warning" of the dangerous condition, and (4) in failing to correct the dangerous condition and each act of negligence was a proximate cause.

The jury found the deceased negligent in continuing his work in light of the circumstances and conditions known to him or the circumstances and conditions which should have been known to him in the exercise of ordinary care and this was a proximate cause of the occurrence in question.

The jury found the percentage of negligence attributable to Hensel Phelps 10%, the City 30%, the State 55% and the deceased 5%.

Article 6252–19, Section 3 of Texas Tort Claims Act, provides in part:

"Sec. 3. Each unit of government in the state shall be liable for money damages for property damage or personal injuries or death when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office arising from the operation or use of a motor-driven vehicle and motor-driven equipment, other than motor-driven equipment used in connection with the operation of floodgates or water release equipment by river authorities created under the laws of this state, under circumstances where such officer or employee would be personally liable to the claimant in accordance with the law of this state, or death or personal injuries so caused from some condition or some use

of tangible property, real or personal, under circumstances where such unit of government, if a private person, would be liable to the claimant in accordance with the law of this state. Such liability is subject to the exceptions contained herein, and it shall not extend to punitive or exemplary damages."

Article 6252–19, Section 18(b), V.A.C.S., provides:

"(b) As to premise defects, the unit of government shall owe to any claimant only the duty owed by private persons to a licensee on private property, unless payment has been made by the claimant for the use of the premises. Provided, however, that the limitation of duty contained in this subsection shall not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads or streets, nor shall it apply to any such duty to warn of the absence, condition or malfunction of traffic signs, signals or warning devices as is required in Section 14(12) hereof."

Article 6252–19, Section 18(b) deals with premise defects in the first sentence and with "special defects" in the last sentence. In *State v. Tennison*, 509 S.W.2d 560 (Tex. 1974), the court decided a "premise defects" case as distinguished from a "special defects" case.

The plaintiffs pleaded the State was in violation of the Texas Tort Claims Act, Art. 6252–19, V.A.C.S., Sections 3 and 18(b) and created or maintained a dangerous condition on its right-of-way. The plaintiffs thereby sought recovery against the State under the "premise defects", "special defects" and "some condition or some use of tangible property, real or personal" theory of recovery provided for in the Act.

■ In "premise defects" cases, the State owes the same duty owed by private persons to a licensee on private property. This limitation of duty does not apply to the duty to warn of "special defects". Nor does it apply to a cause of action alleged to have been caused from some condition or some use of tangible property, real or personal.

The State contends the court erred in failing to grant its motions for an instructed verdict and for judgment non obstante veredicto. It also contends there is no evidence to support the jury's answers to the special issues.

A temporary light pole was set on Interstate 35 near 53rd Street in Austin on November 14, 1974. It had been set for about 2½ months before the accident. The pole was set at the request of the State Highway Department. The location of the pole was selected and designated for the limited purpose of furnishing "some temporary service to energize the illumination system on Interstate Highway 35."

Ronnie L. Choate, superintendent for Hensel Phelps Construction Company, testified substantially as follows:

I have been employed as superintendent for Hensel Phelps for the last eight years. My duties are basically the overall planning and supervision of the job. Our work in the vicinity of Highway 35 and 51st Street here in Austin involved the construction of a new 51st Street bridge plus three turnaround bridges and also some storm sewer and culvert work. I am familiar with the fact that Michael Cooksey was killed at this job site. My office is located within 100 feet of the pole and I saw the pole quite frequently and I was aware of the excavation that was going on every day.

I had a conversation with Michael Cooksey prior to the accident. Mr. Cooksey worked for Udo Haufler and Udo has been doing work for Hensel Phelps for the past two or three years.

The depth of the culvert we were excavating varied from six to seven feet. I was at the scene after the accident and it appeared the excavation for the culvert in the vicinity of the pole was between six and seven feet—very close to the same depth the pole was buried. When the pole fell it took with it the berm area which separated the pole from the excavated area.

He was asked the following questions and he gave the following answers:

"Q How—In point of time, how much earlier or how far prior to the falling of the pole did you make this observation?

A Sir, on the morning of the accident, the Monday morning prior of the accident, midmorning, there was still five to six feet berm area as you described it around the pole, between the pole and the excavation.

Q How deep was the excavation at that point?

A In the vicinity of six to seven feet.

Q Oh, I see.

A Sir, the excavation past the pole was completed on the previous Thursday or Friday.

Q I see. Well, what work was Mr. Cooksey involving himself in at the time of the fall?

A Sir, he was excavating further to the northwest from the pole.

Q Had you seen him excavating in the area you just described to the northwest of the pole shortly prior to the fall of the pole?

A How do you mean—What do you mean by shortly, sir?

Q Well, tell me how—if you did first see him, and then tell me when you saw him doing that work.

A Sir, immediately after lunch, that was the last time that I actually observed Cooksey digging there. He was digging to the northwest of the area where the pole was at.

Q And approximately what time of the day or night did this accident happen?

A Shortly after four o'clock, I believe, sir.

Q And how far to the northwest was Mr. Cooksey?

A I would say 50 to 75 feet.

Q In other words, the work that was to be done in the immediate vicinity of the pole had already been completed?

A Yes, sir, it had been completed the previous Friday.

Q And, therefore, there would be no reason for Mr. Cooksey to be doing any excavation work in the area?

A That's correct, sir.

Q And to your knowledge he was not doing any excavation work in that area?

A At noon I knew he was not, sir.

Q Have you talked to any other employees of Hensel Phelps that claimed—who observed or witnessed him doing any work in the vicinity of the pole around four o'clock?

A No, sir.

Q Can you give us any explanation of what his machinery was doing in that area around four o'clock?

A Sir, I don't quite understand what you—

Q Well—

A —what you are asking.

Q Did you go to the scene before Mr. Cooksey's body had been removed?

A Yes, sir.

Q Was his body and his equipment in the vicinity of the pole at that time?

A Yes, sir. It was lying to the southeast of the pole.

Q What would be—Can you give us any explanation of what his machinery and he, for that matter, would have been doing in the vicinity of the pole at four o'clock if he had already completed the work? Would he be putting, for example, his machinery up? Would he be going back to a central storage depot?

A No, sir. As Mr. Cooksey was completing the excavation on further to the northwest, he would go up and get a load of material back up in the vicinity of where the pole was and then drive up a ramp where he was hauling the spoilage from the trench.

Q I see. In other words, he would go and pick up a load of dirt to the northwest of the location of the pole because that's where he was then doing his work?

A Yes, sir.

Q He had already completed the work in the location of the pole?

A That is correct, sir.

Q And as he would get a load of that dirt, he would have to go back through or transverse the vicinity of the pole in order to take the material he just dug to the northwest of the pole to some dumping area?

A That is correct, sir.

Q Which meant that his tractor would probably be going back and forth in the area of the pole, across from the pole, the area where the pole was located, numerous times a day?

A That's correct, sir.

Q As a matter of fact, every time he got a load?

A Yes, sir."

Choate continued to testify substantially as follows:

I am familiar with the area on plaintiff's Exhibit 4 labeled, "Sand backfill from abandoned gas line removed same day".

Mike Cooksey and Ed Laney, superintendent for Udo Haufler, removed the gas line either Thursday or Friday afternoon before the accident. The line was exposed the preceding Thursday. At that time, Mr. Cooksey, Mr. Laney, Doug Rummel and I stood on the bank in the vicinity of the spoilage pile and discussed the gas line. I know there was five foot of berm area between the pole and the excavation prior to the accident.

He was asked the following questions and he gave the following answers:

"Q It would be safe to say though that the berm area, assuming it was six feet in width, had been somewhat weakened by a sandy type substance as opposed to the natural hard earth?

A Yes, sir.

Q No question about that?

A Yes, sir. I am agreeing to the fact that naturally something will hold a lot better in hard earth than it will in a sandy type material."

Choate continued to testify substantially as follows:

There was no sand backfill placed around the pole by Phelps or Udo. In my opinion, several years ago when the gas line was installed, the normal procedure was to dig the trench, lay some sand and put the line in and then put more sand back on top of it.

After the accident, we noticed the last two or three buckets of material dumped in the excavation spoil pile were sand. I concluded from the fact I found sand in the spoil pile that Mr. Cooksey must have been cutting around the original pole area or picking up the spoilage as it might have sloughed off.

In Chief Justice Greenhill's concurring opinion in *Lowe v. Texas Tech University*, 540 S.W.2d 297 (Tex.1976), he expresses his views about the difficulty of understanding the language in Section 3 of the Texas Tort Claims Act. We are experiencing the same difficulty.

In *Lowe*, the court was called upon to construe that portion of the language contained in Section 3 paraphrased by the court as follows:

"Each unit of government in the state shall be liable for money damages for death or personal injuries *so caused* (i. e., when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office) from some condition or some use of tangible property under circumstances where there would be private liability."

The court was called upon to construe (1) "whether the waiver of immunity is invoked by allegations that Texas Tech through its authorized personnel was negligent in affirmatively furnishing 'equipment, uniforms and pads which were defective'"; and (2) "whether the waiver is also invoked by the allegations of negligent acts of failure to furnish proper equipment and failure or refusal to permit the wearing of proper equipment." The court held both allegations stated a case within the statuto-

ry waiver of immunity arising from some condition or some use of tangible property.

The court observed:

"We have heretofore considered this legislative language in *Texas Dept. of Corrections v. Herring*, 513 S.W.2d 6 (Tex.1974); *McGuire v. Overton Memorial Hospital*, 514 S.W.2d 79 (Tex.Civ.App. —Tyler), writ ref'd n. r. e. by per curiam, 518 S.W.2d 528 (Tex.1975); *Mokry v. University of Texas Health Science Center at Dallas*, 529 S.W.2d 802 (Tex.Civ.App.— Dallas 1975, writ ref'd n. r. e.); and *Beggs v. Texas Dept. of Mental Health and Mental Retardation*, 496 S.W.2d 252 (Tex.Civ.App.—San Antonio 1973, writ ref'd)."

In *Harris County v. Dowlearn*, 489 S.W.2d 140 (Tex.Civ.App.—Houston (14th Dist.) 1972, writ ref. n. r. e.), the court was called upon to decide whether the facts in that case constituted a claim based on "premise defects" or "special defects". The court said:

"Further, we do not believe that the instant claim was based on a premises defect within the meaning of the statute. Appellee alleged and proved the negligence of employees of the appellant and the duty to warn appellee of special defects of which she was not aware after she entered the courthouse. There is no evidence that such condition was open and obvious. We hold that the defect was special, and that the premises defects exclusion contained in the Act does not here apply under section 18 thereof . ."

In *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex.1974), the court said:

"When a party asserts that there is no evidence to support jury findings, we must review the evidence in its most favorable light, considering only the evidence and inferences which support the findings, and rejecting the evidence and inferences contrary to the findings. *Butler v. Hanson*, 455 S.W.2d 942 (Tex.1970); *Langlotz v. Citizens Fidelity Insurance Company*, 505 S.W.2d 249 (Tex.1974). It would be our duty to affirm the judgment of the Court of Civil Appeals if the evidence offered to show negligence were proven to be no more than a scintilla of proof. Thus if the evidence created nothing more than a mere surmise or suspicion of the existence of negligence, such evidence would be, in legal effect, no evidence. *Joske v. Irvine*, 91 Tex. 574, 44 S.W. 1059 (1898). But if negligence may be reasonably inferred from direct evidence, then there is more than a scintilla of evidence. Calvert, 'No Evidence' and 'Insufficient Evidence' Points of Error, 38 Texas Law Review 361, 363 (1960)."

■ Carl E. Anderson, an illumination inspector for the State, selected the location for the pole involved in the accident. No guy wires were placed on this pole. Anderson testified that failure to guy the pole was a direct violation of the National Electric Safety Code. He knew before the accident there was to be excavation in the vicinity of the pole. On the morning before the accident occurred, he discussed the location of the pole with Mr. Neiss, the State's resident engineer. They discussed the condition of the soil where Anderson set the pole. The documentary evidence prepared by the State shows the construction planned in the area where the accident occurred. The testimony of Anderson, Choate and the documentary evidence of the State and other facts and circumstances in evidence constitute some evidence of probative value and support the verdict against the State.

The plaintiffs are entitled to recover against the State on their "special defects" and "some condition or some use of tangible property, real or personal" theory of recovery. These grounds of liability impose a common law duty of ordinary care upon the State.

The State has fifteen points of error complaining about the court's charge and the court's failure to give its requested special issues. It has grouped them for argument in its brief. The only authorities cited under these points are *State v. Tennison*, 509 S.W.2d 560 (Tex.1974); *Lower Neches Valley Authority v. Murphy*, 536 S.W.2d 561 (Tex.1976); and The Texas Tort Claims Act.

Special issue number one asked if the State created or allowed to persist a dangerous condition by locating a power pole without adequate support in unstable terrain in a construction area. Issue number four asked if the City created a dangerous condition by locating a power pole without adequate support in unstable terrain. Issue number six asked if Hensel Phelps created or allowed to persist a dangerous condition in the form of a power pole, as located, without adequate support, in unstable terrain in a construction area. The State contends by the submission of these issues, the court commented on the weight of the evidence.

In paragraph three of its objections to the court's charge, the State objects to issue number one because its requested special issue number one should have been given and said issue was prejudicial to the rights of the State. We find no merit in the State's contention the court erred in the submission of the issues and the court's failure to submit the State's requested issues and hold the court properly submitted the controlling issues. Rule 277, T.R.C.P.

We have considered the entire record and find the verdict against the State is not contrary to the overwhelming weight and preponderance of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

The City of Austin contends there was no evidence to support the jury's affirmative answers to issues number four and five that the City created a dangerous condition by locating the power pole without adequate support in unstable terrain and that it knew of the dangerous condition. It also contends such answers are against the great weight and preponderance of the evidence. It contends there is no evidence and insufficient evidence of proximate cause.

Sam R. Jones, staff engineer for the City of Austin Electric Department, testified substantially as follows:

I arrived at the scene of the accident where Mr. Cooksey was injured about the time the ambulance left. I inspected the soil at the location where the pole had been set and did not notice "any substantial quantities of sand in that sloughed off material. I will say I did notice sand being in the area. By that, I mean that there was a little sand scattered here and there . . ." Sand will weaken the structural integrity of the foundation where the pole is set. However, at the time we set the pole, we had anticipated no excavation in that area. Hensel Phelps' Exhibit No. 1 is a utilities relocation map prepared by the City signed by Blackwell and dated April 26, 1973. This exhibit shows "proposed concrete boxed culvert". The City had knowledge there was going to be a concrete box culvert run in the area when I was requested to set this pole. The map was apparently prepared by the water and sewer department of the City. We know if there is going to be a box culvert, there is going to be excavation.

He was asked the following question and he gave the following answer:

"Q   There's no question that the City of Austin, who prepared this map, had notice of everything about the utilities and the location of that particular concrete box culvert because it's on the map that they prepared?

A   Each department would have an opportunity to have input into that map, yes, sir."

Michael L. Erdmann, Assistant City Manager for the City, had actual notice of the facts and circumstances of Mr. Cooksey's death within hours after the event occurred.

Richard C. Dreiss testified substantially as follows:

I am employed by the City of Austin in the Electric Department as supervisor of field engineering. I supervise all field engineering and approve work orders that are drawn up in the field before they are issued to construction. Plaintiffs' Exhibit 5 is a work order our field crew drew up to furnish temporary highway lighting service. The pole involved in this lawsuit was a City-owned pole and

was set by E. E. Steussey for the City. The highway department selected the location for the pole. The pole was not guyed. We were not aware of the fact that heavy equipment or construction work was to be conducted around the pole.

Fred Heath testified substantially as follows:

I am Distribution Coordinator with the City's electric department. Anderson, with the highway department, showed me the place where he wanted the pole in controversy located and that is where it was staked. I had no knowledge about whether any excavation work would be done around the pole. I would not have placed the pole in this position if I had known there was going to be excavation work in the area adjacent to the pole because it would be dangerous.

■ The evidence establishes the City had knowledge of the construction and excavation work to be done in the area of the pole. It also had knowledge of the underground utilities that might affect the soil in the area of the pole and make the terrain unstable.

In *Champlin Oil & Refining Company v. Chastain*, 403 S.W.2d 376 (Tex.1965), the court said:

"It has been determined by Texas authority that imputed actual notice carries with it the same legal consequences as conscious knowledge. In *Hexter v. Pratt*, 10 S.W.2d 692 (Tex.Com.App.1928) it was said:

'Notice in law is of two kinds—actual and constructive. * * * In common parlance 'actual notice' generally consists in express information of a fact, but in law the term is more comprehensive. In law whatever fairly puts a person on inquiry is sufficient notice, where the means of knowledge are at hand, which if pursued by the proper inquiry the full truth might have been ascertained. Means of knowledge with the duty of using them are in equity equivalent to knowledge itself. * * * So that, in legal parlance, actual knowl-

edge embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed.'

The *Hexter* case was cited with approval by this Court in *Woodward v. Ortiz*, 150 Tex. 75, 237 S.W.2d 286 (1951), wherein it was said:

'It may well be, however, that the tax attorney and the County were charged with *actual notice* of the judgment even though they had no *express knowledge* thereof. *Actual notice* 'embraces those things of which the one sought to be charged has express information, and likewise those things which a reasonably diligent inquiry and exercise of the means of information at hand would have disclosed.' '"

The City contends the duty it owed to the decedent Cooksey is the same as the duty of the utility companies in *Pioneer Natural Gas Co. v. K & M Paving Co.*, 374 S.W.2d 214 (Tex.1963):

"We think it sound, in the light of the cases hereinafter discussed, to hold that at least where the activity is in an urban street or road, and where an unusual or extraordinary use of the surface is necessary to unearth the pipeline, and where there is no contract, statute, ordinance, or regulation governing the matter, the initial burden is upon the one who excavates or digs up the surface to avoid striking the line or to make reasonable inquiry as to the location of any lines which might be encountered. *The duty of the pipeline operator under these circumstances arises, then, when it is requested to alter its lines or their use, when it is asked for information, or when it is otherwise put on such notice that it is required to take particular action to protect the lives or property of others.*" (Emphasis added)

We agree with appellees' contention that: ". . . Under the *Pioneer* rule, the City was put on notice of the condition, requiring action, such as re-locating the

pole or securing it, so that the energized pole in an excavation area would not be dangerous."

Art. 1436a, T.R.C.S., requires those engaged in the generation, transmission or distribution of electric energy to operate in accordance with the National Electric Safety Code.

■ We hold there is some evidence to support the answers to issues 4 and 5.

We have considered the entire record and find the answers to issues 4 and 5 are not against the great weight and preponderance of the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

We hold there is some evidence to support the jury's answers to the proximate cause issues.

The judgment provides Hensel Phelps shall have judgment against the City by way of contribution in proportion to the degree of negligence attributable to each defendant, arising from the damages awarded to Carol Marie Cooksey. The City contends it had a defense to the adult plaintiff's cause of action because she did not give the City notice provided for under the City Charter.

The City contends the court erred in awarding Hensel Phelps judgment against it by way of contribution for damages awarded to Carol Marie Cooksey.

Art. 2212 was repealed by the Comparative Negligence Act, Article 2212a. The contribution provisions are as follows:

"*Contribution among joint tort-feasors*
Sec. 2. (a) In this section:

(1) 'Claimant' means any party seeking relief, whether he is a plaintiff, counterclaimant, or cross-claimant.

(2) 'Defendant' includes any party from whom a claimant seeks relief.

(b) In a case in which there is more than one defendant, and the claimant's negligence does not exceed the total negligence of all defendants, contribution to the damages awarded to the claimant shall be in proportion to the percentage of negligence attributable to each defendant.

(c) Each defendant is jointly and severally liable for the entire amount of the judgment awarded the claimant, except that a defendant whose negligence is less than that of the claimant is liable to the claimant only for that portion of the judgment which represents the percentage of negligence attributable to him."

The court rendered judgment in favor of Carol Marie Cooksey against Hensel Phelps and the State. Because Mrs. Cooksey did not give notice to the City as required by the City Charter, no judgment was rendered against the City for her damages.

■ Appellees contend the comparative negligence statute eliminates the limitation that the contribution right existed only against a party who was liable to the plaintiff. They contend Hensel Phelps, the State and the City were all claimants seeking contribution and the court awarded contribution "in proportion to the percentage of negligence attributable to each defendant". The appellees contend the act creates a statutory right of contribution which is independent of the plaintiffs' claim, instead of a derivative claim arising from joint liability and payment by one joint tort-feasor.

The comparative negligence statute allows contribution only among joint tort-feasors. We hold the City was not a joint tort-feasor insofar as Mrs. Cooksey's damages were concerned.

### St. Paul Insurance Company's Appeal

St. Paul Insurance Company has appealed from that part of the judgment awarding attorney's fees of 25% of the company's subrogated recovery to the attorney for appellees under Section 6a of Article 8307 of V.A.C.S.

At the outset, we are confronted with appellees' contention St. Paul has failed to preserve a majority of its points of error by failing to assert them in its amended motion for a new trial.

Rule 320, T.R.C.P., provides that the motion for new trial shall specify each ground

on which it is founded, and no ground not specified shall be considered.

Subdivision (b) of Rule 418, T.R.C.P., provides in part:

"(b) A statement of the points upon which the appeal is predicated, separately numbered in short form and without argument, and germane to one. or more assignments of error when assignments are required . . ."

There is no indication in St. Paul's points of error that any of them are germane to any of its assignments of error in its amended motion for new trial. For example, its first point of error asserts the court erred in refusing to prepare and file findings of fact and conclusions of law in support of its judgment awarding an attorney's fee of 25% of the carrier's subrogated recovery to the attorney for appellees as prescribed by Rule 296 T.R.C.P. This alleged error it not asserted as an assignment of error in St. Paul's amended motion for a new trial.

Judgment in this case was rendered upon the verdict of a jury. Rule 296 applies to cases tried before the court without a jury. Findings and conclusions are neither necessary nor proper in a jury trial. See *Ditto v. Ditto Investment Company,* 158 Tex. 104, 309 S.W.2d 219 (1958); *Fancher v. Cadwell,* 159 Tex. 8, 314 S.W.2d 820 (1958); *Cox v. Rhodes,* 233 S.W.2d 924 (Tex.Civ. App.—El Paso 1950, no writ).

St. Paul's amended motion for a new trial does have an assignment of error which is germane to its point of error the trial court erred in awarding an attorney's fee to the attorney for appellees out of the carrier's subrogated recovery because said attorney did not establish his compliance with the disclosure requirements of V.A.C.S., Art. 8307, Section 6a. The pertinent portions are as follows:

". . . If compensation be claimed under this law by the injured employee or his legal beneficiaries, then the association shall be subrogated to the rights of the injured employee, and may enforce in the name of the injured employee or of his legal beneficiaries the liability of said other person, and in case the recovery is for a sum greater than that paid or assumed by the association to the employee or his legal beneficiaries, then out of the sum so recovered the association shall reimburse itself and pay said costs and the excess so recovered shall be paid to the injured employee or his beneficiaries. However, when the claimant is represented by an attorney, and the association's interest is not actively represented by an attorney, the association shall pay such fee to the claimant's attorney not to exceed one-third (⅓) of said subrogation recovery or as may have been agreed upon between the claimant's attorney and the association or in the absence of such agreement the court shall allow a reasonable attorney's fee to the claimant's attorney for recovery of the association's interest which in no case shall exceed thirty-three and one-third per cent (33⅓%) payable out of the association's part of the recovery. In any case where the claimant's attorney is also representing the subrogated association, a full written disclosure must be made to the claimant, prior to actual employment by the association as an attorney, and acknowledged by the claimant, and a signed copy of the same furnished to all concerned parties and made a part of the file in the Industrial Accident Board. A copy of the disclosure with authorization and consent, shall also be filed with the claimant's pleadings prior to any judgment entered and approved by the court. Unless the claimant's attorney complies with all of the requirements as prescribed in this section, the attorney shall not be entitled to receive any of the fees prescribed in this section to which he would be entitled pursuant to an agreement with the association."

Final judgment was rendered in this case on June 21, 1976. Ronald D. Krist, attorney for plaintiffs, filed an application for attorney's fees pursuant to Article 8307, Section 6a of V.A.C.S., which shows to have been filed June 18, 1976. This application for attorney's fees was also signed by Carol

Marie Cooksey, individually and as next friend for her minor children.

The court ordered:

"It is further ordered, adjudged and decreed that out of the sum awarded St. Paul Insurance Company and above set forth, that Ronald D. Krist, Attorney at Law, be granted $1,172.50 as attorneys' fees pursuant to Article 8307, Section 6(a) of the Texas Revised Civil Statutes, together with 25% of all sums paid prior to final recovery in this cause."

■ St. Paul's point the court erred in awarding Krist attorney's fees because he had not complied with the disclosure requirements cannot be sustained. We hold filing application for attorney's fees by the attorney which was signed by the plaintiffs before the judgment was rendered constitutes substantial compliance with the statute.

We have considered all of St. Paul's points of error and find no merit in them. They are overruled.

We have considered all of the State's points of error and find no merit in them. The are overruled.

The judgment is reformed by deleting that portion of the judgment awarding Hensel Phelps, Inc. judgment against the City of Austin by way of contribution for damages awarded to Carol Marie Cooksey.

The City's other points are overruled.

The judgment is reformed and as reformed is affirmed.