CITY OF SAN ANTONIO,
Texas, Appellant,

v.

Sandra Lynne SCHNEIDER, et
al., Appellees.

No. 04–89–00153–CV.

Court of Appeals of Texas,
San Antonio.

March 7, 1990.
Rehearing Denied April 16, 1990.

Preston H. Dial, Jr., Groce, Locke & Hebdon, San Antonio, for appellant.

Richard J. Karam, Bruce J. Mery, Dan W. McCauley, Jimmy Parks, and Martin A. Gewertz, San Antonio, for appellees.

Before REEVES and CHAPA, JJ., and GERALD T. BISSETT, Assigned Justice.

## OPINION

GERALD T. BISSETT, Assigned Justice [1].

This is an appeal by the City of San Antonio, Texas, defendant in the trial court, from a judgment in favor of the plaintiffs Sandra Lynne Schneider, David Meyer and Rosemary Meyer, each of whom recovered damages caused when a fire truck owned by the City of San Antonio collided with an automobile owned by David Meyer. Trial was to a jury. Based on the jury's answers to the questions submitted by the trial court, judgment was rendered that Sandra Lynne Schneider recover $100,000.00, that Rosemary Meyer recover $34,260.00 and that David Meyer recover $7,500.00, together with interests thereon at the rate of ten percent (10%) per annum from date of judgment until paid. The recoveries are against the City of San Antonio only.

Henceforth, the City of San Antonio will be referred to as "the City." Plaintiffs will be referred to as either "plaintiffs" or by name.

The accident made the basis of this suit occurred in the 4900 block of Wurzbach Road, in San Antonio, Texas, on February 2, 1986, at approximately one o'clock in the afternoon. At that time, the roadway was wet and slippery due to a light rain that was falling. Immediately preceding the accident involved in this appeal, Ms. Schneider approached the scene of a collision between a Chevrolet Blazer pick-up being

---

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX. GOV'T CODE ANN. § 74.003 (Vernon 1988).

driven by a third person, which had occurred a few minutes earlier on Wurzbach Road. The Blazer was then stopped in the northbound lane of Wurzbach Road, with a portion thereof [2] extending into the southbound lane. Ms. Schneider, upon arrival at the scene, noticed that one of the occupants in the Blazer (Mrs. Meyer) was injured and she entered the Blazer to administer first aid. While she did so, a fire truck, which weighed 36,000 pounds, owned by the City, and being driven by James C. Crawford, its agent and employee, struck the Blazer and caused Ms. Schneider to suffer personal injuries.

The 4900 Block of Wurzbach Road was officially annexed by the City on December 30, 1985. On January 7, 1986, a citizen's complaint was made by Robert A Wehrmeyer, Jr. describing an incident on New Year's Day (January 1, 1986) at the location. He reported that he lost control of his vehicle and personally witnessed numerous cars losing control of their vehicles. He described two (2) separate accidents occurring at the location on the same day. He stated: "I believe that although the condition of the day contributed to the incidents mentioned, the design and layout of the road itself contributed significantly to the problem ...", and that "the situation is a serious one...." Mr. Andrew J. Ballard, the City traffic manager, agreed with complaints made by Mr. Wehrmeyer and implemented changes which included placement of "speed advisory" signs and resurfacing of the road. However, the City did not place such signs until February 6, 1986, four days following the incident made the basis of this lawsuit. The City also resurfaced the roadway in the latter part of May or early June of 1986, 4 to 5 months after the incident. Mr. Ballard further testified that in 1986 a total of fifty-seven (57) accidents occurred on that section of Wurzbach Road: forty-seven (47) of which occurred prior to the resurfacing and ten (10) which occurred after the resurfacing.

Mr. Crawford, the driver of the fire truck, testified: 1) at the time of the incident in question, it was misting lightly, which created a very hazardous condition on Wurzbach Road due to a combination of oil and gasoline that accumulated on the roadway; 2) Wurzbach Road was slippery, and he knew at the time that it was dangerous; 3) under the conditions then existing, he should not have driven the fire truck at a speed of more than five (5) to ten (10) miles per hour, which he stated he was driving immediately preceding the striking of the Blazer; 4) he first saw the Blazer approximately eighty (80) to one hundred (100) feet prior to impact; 5) he applied his brakes when he first observed the Blazer (and the Buick), pumped them as he had been taught, started skidding and collided with the Blazer, and sent it spinning off the roadway; and 6) the expired time from his leaving the station (in response to an emergency call) to the scene of the collision with the Blazer was approximately 6 minutes.[3]

There were no speed limit signs in place in the area of the accident on February 2, 1986. There were no warning signs which advised the driving public that the road was "slippery when wet." The only signs in place at that time were "chevrons" or directional signs indicating a curve in the roadway.

The only expert testimony offered was that of Mr. Charles Ruble, an engineer specializing in accident analysis. He utilized photographs, skid marks, weights and positions of the respective vehicles, the degree of incline, recognized laws of physics, and his personal knowledge of the roadway, to conclude: 1) Mr. Crawford was traveling at least twenty-eight (28) miles per hour immediately prior to braking; 2) he left eighty (80) feet of skid marks (twenty-four (24) feet prior to impact and fifty-six (56) feet after impact); and 3) Mr. Crawford had visibility to the Blazer for at least two hundred forty (240) feet. Mr. Ruble further testified that Mr. Crawford

---

2. There is a dispute in the record concerning this fact. The City's witness stated that the Blazer was "blocking" the southbound lane at the time of the collision between the fire truck and the Blazer. Ms. Meyer testified that no

more than two inches protruded into the southbound lane.

3. An average of 27 miles per hour.

could have safely stopped the fire truck, even if he was driving at twenty-eight (28) miles per hour, if he had kept a proper lookout and had taken timely evasive action, or conversely, that if he, in fact, was traveling five (5) to ten (10) miles per hour, he could have stopped his vehicle even if his first evasive action was at eighty (80) feet from impact rather than two hundred forty (240) feet.

The jury, in its answer to Question No. 1, found that the City, through its agent James A. Crawford, was negligent as to speed, lookout, application of brakes, and control, and that each was a proximate cause of the occurrence in question. With reference to its findings that Crawford was negligent as to speed, which was found to be a proximate cause of the accident upon which this suit was based, the trial court submitted an instruction, which was not objected to by the City, regarding "maximum speed." That instruction reads:

"**MAXIMUM SPEED.**" You are instructed that the maximum speed limit at the location in question is restricted as follows:

No person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing. In every event, speed shall be so controlled as may be necessary to avoid colliding with any person, vehicle, or other conveyance on or entering the highway in compliance with legal requirements and the duty of all persons to use due care.

The driver of every vehicle shall, consistent with the requirements of the above paragraph, drive at an appropriate reduced speed when approaching and crossing an intersection or railway grade crossing, when approaching or going around a curve, when approaching a hill crest, when traveling upon any narrow or winding roadway, and when special hazards exist with respect to pedestrians, other traffic or by reason of weather or highway conditions.

The City, in its first point of error, contends that the trial court erred in granting judgment for plaintiffs "because it was uncontroverted that the fire truck was responding to an emergency call, and there was no evidence or insufficient evidence of lack of compliance with the laws and ordinances applicable to emergency action." We disagree.

On September 1, 1985, the Texas Legislature codified the Texas Tort Claims Act as Chapter 101 of the Texas Civil Practice and Remedies Code. The relevant provisions applicable at the time of the incident on February 2, 1986, read as follows:

Section 101.021. **Governmental Liability**

A governmental unit in the state is liable for:

(1) ... personal injury ... caused by the wrongful act of omission or the negligence of an employee acting within the scope of employment if:

(A.) the ... personal injury ... arises from the operation or use of a motor-driven vehicle....; and

(B.) the employee would be personally liable to the claimant according to Texas Law....

\*     \*     \*     \*     \*     \*

Section 101.055. **Certain Governmental Functions**

This chapter does not apply to a claim arising:

\*     \*     \*     \*     \*     \*

(2) from the action of an employee while responding to an emergency call or reacting to an emergency situation if the action is in compliance with the laws and ordinances applicable to emergency action.

At the time of the accident, the City had enacted Article IX to the City Code regarding emergency vehicles. Division 2 thereof pertains to authorized emergency vehicle. It provides:

Section 19–321: **Authorized Emergency Vehicles Governed by State Law.**

Authorized emergency vehicles shall be governed by the pertinent provisions of the State traffic laws. (State Law reference-application of State traffic laws to authorize emergency vehicles,

Vernon's Ann.Civ.Stat. art. 6701d, section 24.)

TEX.REV.CIV.STAT.ANN. art. 6701d, § 24 (Vernon 1977) as it existed at the time relevant to this appeal, provided:

Section 24. **Additional Exceptions**

\* \* \* \* \* \*

(b) The driver of an authorized emergency vehicle, when responding to an emergency call ... or responding to but not upon returning from a fire alarm, may exercise the privileges set forth in this section, but subject to the conditions herein stated.

(c) The driver of an authorized emergency vehicle may:

1. Park or stand, irrespective of the provisions of this chapter;

2. Proceed past a red or stop signal or stop sign, but only after slowing down as may be necessary for safe operation;

3. Exceed the maximum speed limits so long as he does not endanger life or property;

4. Disregard regulations governing direction of movement or turning in specified directions.

(d) The exemptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use, at the direction of the driver of the vehicle, in accordance with policies of the department or the local government, of audible or visible signals meeting the requirements of section 124[4] of this act....

(e) The foregoing provisions shall not relieve the driver of an authorized emergency vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provision protect the driver from the consequences of his reckless disregard for the safety of others.

(f) The provisions of this act applicable to the drivers of vehicles upon the highways shall apply to the drivers of all vehicles owned or operated ... by the City ..., subject to such specific exceptions as are set forth in this act with reference to authorized emergency vehicles.

Section 26 of Article 6701d specifically states that no local authorities shall enact or enforce any ordinance, rule, or regulation in conflict with the above provisions, however, local authorities may adopt additional traffic regulations which are not in conflict.

The City argues that it was exempt from liability under the provision of TEX.CIV. PRAC. & REM.CODE ANN. § 101.055(2) in effect at the time of the accident and when this suit was filed because Mr. Crawford was responding to an emergency call at the time in question, which was in compliance with the applicable laws and ordinances. It is undisputed that when the call came into the fire station that Crawford and the other firefighters on the fire truck understood that an emergency existed. There is ample evidence to support the jury's finding that the fire truck had its emergency lights and siren operating prior to the collision with the Blazer. However, there is some evidence which casts doubt on whether there was, in fact, an emergency immediately prior to the accident. The call came in over the radio from Fire Alarm Dispatch at the San Antonio Police Department dispatching a unit to J.C. Penney's at Ingram Park Mall. Mr. Crawford knew it was a "still" alarm rather than a "regular" alarm which indicated to him that a building was not on fire. Prior to reaching the accident site, Mr. Crawford intercepted shortwave messages from another firefighter in the immediate vicinity which indicated to him that the call he was on was for a telephone pole or power line on fire rather than a building. The Chief directed him to "make the call anyway." Mr. Crawford said that he did not think there was going to be anything to the run and in the back of his mind he was thinking that he could "slow down."

In *Black v. Nueces County Rural Fire Prevention Dist. No. 2*, 695 S.W.2d 562 (Tex.1985), the City of Corpus Christi did not have any ordinances pertaining to

---

**4.** Art. 6701d, § 124 does not affect this appeal.

emergencies. In that case, Ron Black, a volunteer fireman, was struck and injured by a City fire truck as it backed into position at the scene of a fire. Mr. Black obtained judgment against the City based on finding of negligence. The Supreme Court of Texas interpreted the Texas Tort Claims Act, TEX.REV.CIV.STAT.ANN. art. 6252–19 (Vernon 1970). The Court held:

> [I]n the absence of laws or ordinances applicable to emergency action, there is no exception to the waiver of sovereign immunity. The District and the City in this case are thus liable for the negligence of their employees. This conclusion follows from the plain language of the statute: The District and the City could not comply with an ordinance unless an ordinance in fact existed.

*Id.* at 563.

▆▆ The waiver of sovereign immunity in the Texas Tort Claims Act extends to situations involving the use of a motor-driven vehicle under circumstances where the employee or agent of a city would be personally liable to the claimant in accordance with the law of this State. The instant case falls squarely within this provision. There is no exception to the waiver of immunity in this case. Contrary to the assertion in this appeal by the City, the ordinance of the City of San Antonio applicable to emergency action did not in fact apply; the ordinance, quoted above, simply referred to state laws; it did not amount to additional traffic regulations which were not in conflict with state law.

▆▆ The action by Crawford was not in compliance with any city ordinance or state law applicable to emergency action. The City did not object to the submission of Question No. 1 to the jury, nor did it challenge the jury's answers thereto by a point of error in this appeal. Consequently, such answers are firmly established, are binding on the City and cannot now be disturbed. *Gulf Coast State Bank v. Emenhiser*, 562 S.W.2d 449, 452–53 (Tex.1978). Thus, the City is liable in damages to plaintiffs for the negligence of James G. Crawford, its employee and agent.

The jury, in answer to Question No. 3, also found that James G. Crawford "failed to drive the fire truck with due regard for the safety of all persons" and "showed reckless disregard for the safety of others in the operation of the fire truck" and each was a proximate cause of the occurrence in question.

The City first argues that the conditions set out in article 6701d, section 24(e) cannot be engrafted upon the Texas Tort Claims Act to result in a waiver of immunity because that section in its entirety only enumerates privileges which are subject to specified conditions. It says, in essence, that the provisions of section 24(e) apply only to the privileges set forth in section 24(c). We do not agree. While it is true that section 24(c) provides that a driver of a motor-driven vehicle may park improperly, run a red light or stop sign, exceed maximum speed limits so long as he does not endanger life or property, and disregard regulations governing direction of movement or turning, section 24(e) states that those provisions (privileges) "shall not relieve" the driver of the emergency vehicle from driving with due regard for the safety of all persons on or about the roadway, nor shall such provisions absolve the driver from the consequences of his reckless disregard for the safety of others. The phrase "shall not relieve," found in section 24(e), mandates that the provisions of section (c) will not relieve the driver of any emergency vehicle of a duty that exists before he violates the motor vehicle laws of this State in an emergency action, and that duty continues to exist after violation of those laws.

TEX.REV.CIV.STAT.ANN. art. 6701d, § 166(a) (Vernon 1977) provides that no person shall drive a vehicle on a highway at a speed greater than is reasonable and prudent under the circumstances then existing. Subsections (b) and (c) of section 166 of the statute mandate that the driver of every vehicle shall drive at an appropriate reduced speed when a special hazard or dangerous condition exists because of weather or highway conditions.

■ In the case at bar, in addition to Mr. Crawford's negligence as found by the jury in its answer to Question No. 1, the evidence shows that the contact between the fire truck and the Blazer was made in the Blazer's lane of traffic, which establishes the fact that Mr. Crawford violated provision number four of section 24(c) by disregarding regulations governing direction of movement; the fire truck was in the wrong lane of traffic when it struck the Blazer.

The City further argues: 1) "there was no evidence to warrant the submission to the jury of whether the fire truck was driven with reckless disregard for the safety of others," and 2) "there was (factually) insufficient evidence to support a jury finding that the fire truck was driven with reckless disregard for the safety of others." The statement of facts will not sustain the arguments.

A court of appeals, in order to sustain a "no evidence" point, must determine that there is no evidence having probative force upon which the jury could have made the findings complained of by the appellant. *Whiteman v. Harris*, 123 S.W.2d 699 (Tex. Civ.App.—Fort Worth 1938, writ ref'd). "In making this determination, all evidence must be considered in the light most favorable to the party in whose favor the verdict was rendered, and every reasonable inference deducible from the evidence is to be indulged in such party's favor." *Harbin v. State*, 461 S.W.2d 591, 592 (Tex.1970). In determining whether the evidence is "factually insufficient" to support the jury's answers, the court of appeals must consider all of the evidence. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). Apparently, the City's argument concerning "no evidence" and "factually insufficient evidence" is directed towards the jury's answers to Questions Nos. 1 and 3.

There is no precise statutory or case law definition for "reckless disregard for the safety of others" and/or "the duty to drive with due regard for the safety of all persons." It appears that the breach of such duty lies between "ordinary" and "gross" negligence. In *White v. State*, 647 S.W.2d

751, 753 (Tex.App.—Fort Worth 1983, pet. ref'd), the court said: "Proof of an evil or malicious intent is not an element of reckless driving." The court in *Napier v. Mooneyham*, 94 S.W.2d 564, 567–68 (Tex.Civ. App.—Eastland 1936, writ dism'd), stated that "reckless disregard" includes essential characteristics of gross negligence, and indicates an entire want of care sufficient to raise the belief or presumption that the act or omission complained of was the result of conscious indifference to the rights, welfare, or safety of the person or persons affected by it.

The language in *Burk Royalty Co. v. Walls*, 616 S.W.2d 911 (Tex.1981), is significant in determining the meaning of "reckless disregard" for the safety of others. It was said:

"Heedless and reckless disregard" means more than momentary thoughtlessness, inadvertence, or error of judgment. It means such an entire want of care as to indicate that the act or omission in question was the result of conscious indifference to the rights, welfare, or safety of the persons affected by it. As discussed above, "heedless and reckless disregard" and "gross negligence" are synonymous terms . . .

*Id.* at 920.

\* \* \* \* \* \*

. . . What lifts ordinary negligence into gross negligence is the mental attitude of the defendant; that is what justified the penal nature of the imposition of exemplary damages. The plaintiff must show that the defendant was consciously, i.e., knowingly, indifferent to his rights, welfare and safety. In other words, the plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrated that he didn't care. Such conduct can be active or passive in nature. . . .

*Id.* at 922.

■ Mr. Crawford admitted that he had personal knowledge of the dangerous section of Wurzbach Road, having made several prior emergency runs on that very roadway. He knew that light mist would make the roadway extremely dangerous, explain-

ing in precise detail how gasoline and dirt create a paste-like effect on the road. He also knew, or had reason to believe, that his emergency run was going to be a "still" alarm. He further stated that he should have been traveling five (5) to ten (10) miles per hour at that segment of the roadway and that if he failed to notice the stranded vehicles until eighty (80) feet prior to impact when he had visibility of at least two hundred forty (240) feet, this action and/or inaction would constitute negligence. On the occasion in question there is competent evidence that Mr. Crawford, prior to the application of his brakes, was going at least twenty-eight (28) miles per hour with a 36,000 pound vehicle on a wet, slippery surface. There is evidence that he had at least two hundred forty (240) feet of visibility viewed from an elevation of eight (8) feet above the road surface, but did not take evasive action until eighty (80) feet from point of impact. That evidence, along with other evidence hereinbefore discussed, is sufficient to support the jury's answers to Question No. 3.

Furthermore, assuming that Mr. Crawford was acting in an emergency situation, we do not believe that under the totality of the evidence that Mr. Crawford, as a matter of law, drove the fire truck with due regard for the safety of others. *See Guzman v. City of San Antonio,* 766 S.W.2d 858, 860 (Tex.App.—San Antonio 1989, no writ).

The jury, in response to Question No. 4, found that the condition of the roadway at the 4900 block of Wurzbach was, under prevailing conditions, a "special defect." The jury was instructed "that a 'special defect' is generally those kinds of dangerous conditions on roadways which may have been specially created and which are not routine maintenance defects." The jury, in response to Question No. 5, further found that the City knew or should have known of the "special defect" on the date of the accident and failed to either make the roadway safe or adequately warn of the "special defect" and each such failure was a proximate cause of the incident in question. And the jury, in response to Question No. 6, found that the City failed to either make the roadway safe where the incident occurred or failed to adequately warn of the special defect on the roadway.

The City, in its second point of error, contends that the trial court erred in failing to grant its motion for instructed verdict and in submitting Questions 4, 5 and 6 because there was no evidence of a "special defect." We disagree.

The City argues that a special defect must either be related to an excavation on the roadway, an actual obstruction on the roadway, or created in some way by a governmental unit. It asserts that there is no evidence of such excavation, obstruction, or that the defect was created by it, and to allow the jury to label the factual condition of the roadway as a "special defect" was to give the jury legislative powers.

The pertinent statute, TEX.CIV.PRAC. & REM.CODE ANN. § 101.022, provides in relevant part:

**Duty Owed: Premises and Special Defects.**

(a) If a claim arises from a premise defect, the governmental unit owes to the claimant only the duty that a private person owes to a licensee on private property, unless the claimant pays for the use of the premises.

(b) The limitation of duty in this section does not apply to the duty to warn of special defects such as excavations or obstructions on highways, roads, or streets ...

The statute does not define the term "special defect"; instead it gives examples of what a special defect is ... i.e., "such as excavations or obstructions on highways, roads, or streets." The supreme court has stated that these two examples were not meant to be exclusive but by applying the ejusdem generis rule, "we are to construe 'special defect' to include those defects of the same kind or class as the ones expressly mentioned." *County of Harris v. Eaton,* 573 S.W.2d 177, 179 (Tex.1978).

The following conditions have been held to be special defects: 1) one or more unattached wall panels which fell on the plain-

tiff in a courthouse. *Harris County v. Dowlearn,* 489 S.W.2d 140, 147 (Tex.Civ. App.—Houston [14th Dist.] 1972, writ ref'd n.r.e.); 2) a ditch adjacent to the end of a dead end street; *City of Houston v. Jean,* 517 S.W.2d 596, 599 (Tex.Civ.App.—Houston [1st Dist.] 1974, writ ref'd n.r.e.); 3) a temporary light pole without proper support in unstable terrain on a highway construction site; *City of Austin v. Cooksey,* 561 S.W.2d 874, 880 (Tex.Civ.App.—Eastland), *rev'd on other grounds,* 570 S.W.2d 386 (Tex.1978); 4) an abnormally large hole worn in an asphalt highway; *County of Harris v. Eaton,* 573 S.W.2d 177, 180 (Tex. 1978); 5) a slick, muddy portion of a highway under construction; *State of Texas v. McBride,* 601 S.W.2d 552, 558 (Tex.Civ. App.—Waco 1980, writ ref'd n.r.e.); 6) two feet of floor water at a low water crossing obstructing traffic; *Miranda v. State,* 591 S.W.2d 568, 570 (Tex.Civ.App.—El Paso 1979, no writ); and 7) a condition created by thick brush hiding an arroyo running alongside a park road and an unmarked break in the brush appearing to be an intersecting road, but which was, in fact, a drop-off into the arroyo. *Chappel v. Dwyer,* 611 S.W.2d 158 (Tex.Civ.App.—El Paso 1981, no writ).

The following conditions were held not to be a special defect: 1) mounds of clay in a canal bottom beneath the water. *Lower Neches Valley Authority v. Murphy,* 536 S.W.2d 561, 563 (Tex.1976); 2) old pavement marking at a detour on the highway that became visible. *State Dept. of Highways & Public Transp. v. Carson,* 599 S.W.2d 852 (Tex.Civ.App.—El Paso 1980, writ ref'd n.r.e.); and 3) a severe depression in the highway where the asphalt had sunk below an abutting concrete bridge. *Sutton v. State Highway Dept.,* 549 S.W.2d 59, 61 (Tex.Civ.App.—Waco 1977, writ ref'd n.r.e.).

In *State v. Tennison,* 509 S.W.2d 560, 562 (Tex.1974), Justice Denton, writing for the court in a Texas Tort Claims case, said:

It is well settled in this State that if the person injured was on the premises as a licensee, the duty that the proprietor or licensor owed him was not to injury him by willful, wanton or gross negligence. [cases cited] An exception to the general rule is that when the licensor has knowledge of a dangerous condition, and the licensee does not, a duty is owed on the part of the licensor to either warn the licensee or to make the condition reasonably safe.... Actual knowledge rather than constructive knowledge of the dangerous condition is required ...

*Accord, Lower Neches Valley Authority v. Murphy,* 536 S.W.2d 561 (Tex.1976).

■ In a "special defect" case, such as the instant case, the duty of the City is the equivalent of that owed by a licensor to a licensee. *See Smith v. State,* 716 S.W.2d 177, 179 (Tex.App.—El Paso 1986, writ ref'd n.r.e.).

In the case of *State v. McBride,* 601 S.W.2d 552 (Tex.Civ.App.—Waco 1980, writ ref'd n.r.e.), the State was in the process of reworking a segment of a public roadway when the plaintiff McBride, while traveling over this segment of the roadway under rainy conditions, lost control of her vehicle, skidded and suffered personal injuries. The evidence showed that the portion of the roadway where the accident occurred was very slick and that vehicles would slide, even at low speeds; that the State had many types of warnings signs available, including one which would read "Slick When Wet," however, no signs were in place except "Slow" and "35 MPH." The court held that the dangerous condition in question was a "special defect." Judgment in favor of plaintiff was affirmed.

■ The facts pertaining to the condition of the roadways in this case were undisputed. A southbound vehicle, as was the fire truck, would crest the hill and, 1) start down a five degree downslope; 2) reduce to a three degree downslope; and 3) proceed through a double or "S" turn that was slick when there had been a slight rain. The only warning signs in place at the time of the accident were the chevrons which warned of the "S" turn or curve.

When the condition complained of is obviously an excavation or obstruction or a defect of the same kind or class on a highway, road, or street, and it is undisputed

that the governmental unit had actual knowledge of it, it can be said that the dangerous condition is a "special defect" as a matter of law giving rise to the duty to warn or make the condition reasonably safe. *See Miranda v. State,* 591 S.W.2d 568 (Tex.Civ.App.—El Paso 1979, no writ). However, it follows that when the condition complained of is not an excavation or obstruction on a highway, road or street, the issue of whether the condition is a "special defect" is a question of fact to be determined by the trier of fact for the purpose of establishing the duty on the part of the governmental unit to warn of the condition or to make it reasonably safe.

■ In this case, it is undisputed that the City had actual knowledge of the dangerous condition prior to the accident upon which this suit is founded. Mr. Ballard, Traffic Engineer for the City, testified that he was familiar with the particular roadway in January and February of 1986 and that he agreed that something had to be done about the problem that existed. He agreed with the spirit of the citizen's complaint, hereinbefore set out, and promptly implemented the installation of traffic signs after having been advised of the complaint. Statistics of accidents at that location before and after the resurfacing supported the existence of a "special defect" at the time of the accident. The expert witness, Mr. Charles Ruble, testified that he was familiar with the road surface prior to resurfacing and that taking into account the downhill slide, its composition, and wet conditions, the roadway becomes slippery. He gave the road surface under wet conditions a 0.27 coefficient of friction rating, whereas under dry conditions it would have a 0.7. He further stated that the location was a bad section of roadway prior to the resurfacing.

■ Mr. Willie James, who was employed by the Traffic Engineering Department of the City, testified that the reason why the resurfacing of the roadway was not accomplished immediately after it was recommended was because the resurfacing is considered a "major budgeted item." It is also undisputed that signs saying the roadway was "slippery when wet," were not in place when the accident occurred. Those signs were installed four days later.

There was legally sufficient evidence to support the submission of Questions 4, 5 and 6 to the jury. The trial court correctly denied the City's motion for an instructed verdict and properly submitted those questions to the jury.

■ The City, in its third and final point of error, contends that "the trial court erred in refusing to submit a question to the jury inquiring if the City failed to remedy the 4900 block of Wurzbach Road within a reasonable time after learning of the condition." We do not agree.

The proposed question is not a controlling question. The City had the duty to *either* "warn" or "remedy." An inquiry *only* to whether or not they failed to "remedy" within a reasonable time, even if answered in the City's favor, would not relieve it of the duty to "warn" and could not alter the judgment ultimately entered.

The City argues that § 101.060(a)(2) of the Texas Tort Claims Act removes the negligence from the Tort Claims Act unless the failure is not corrected within a reasonable time. The City simply has misinterpreted this section.

Section 101.060 removes certain claims from the purview of the Texas Tort Claims Act relating to traffic and road control devices. Subsection (a)(2) pertains to a sign or warning device that was in place at one time but was subsequently removed, is malfunctioning or is endowed with some condition that should be corrected by the governmental unit. In such case, the governmental unit must be *on notice* of the absence, condition of malfunction and must have failed to correct it within a reasonable time after such notice. The subsection simply does not apply to the special defect presented by the case at hand. The trial court correctly refused to submit the proposed question.

We have carefully considered all of the City's points of error. They are overruled. In view of our affirming the judgment of

the trial court, it is not necessary that we consider plaintiffs' cross-point.

The judgment of the trial court is affirmed.