The CITY OF DENTON, Texas &
Frances Melton, Appellants,

v.

Michael Van PAGE and Ida Louise
Page, Appellees.

Nos. 2–84–038–CV, 2–84–039–CV.

Court of Appeals of Texas,
Forth Worth.

Jan. 17, 1985.

---

Henderson, Bryant & Wolfe, John B. Kyle, Sherman, for The City of Denton, Texas.

Frances C. Melton, pro se.

Philips, White, Davidge, Griffin, Shelton, Eames, Wood & Duncan, R. William Wood, Denton, for appellees.

Before HUGHES, JOE SPURLOCK, II and HILL, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

This is a personal injury case arising out of injuries received by Michael Van Page,

appellee, during a fire in a building belonging to Frances Melton, appellant. Page alleged that the fire was caused by the dangerous and unsafe condition of the building which was created and maintained by the negligence of both Melton and the Fire Department of the City of Denton, appellant. Page's wife, Ida Louise (Lou) Page, appellee, joined in the suit and sought damages for mental anguish, loss of consortium and loss of household services. Based on a jury's answer to special issues, the trial court entered judgment for the Pages, appellees. From such judgment, Melton and the City of Denton bring the present appeal.

We reform and affirm.

Frances Melton has submitted a pro se brief which sets out eight points of error and cites only two authorities in support of her contentions. Although her failure to cite authorities is in direct conflict with the requirements of TEX.R.CIV.P. 418(e), we believe that Melton's points of error should nevertheless be addressed in this instance. TEX.R.CIV.P. 1. Melton's point of error one contends that it was error for the trial court to deny her motion for a directed verdict and motion for judgment non obstante veredicto. Points of error two, three, four, and six complain of the trial court's charge to the jury. Point of error five complains of the trial court's exclusion of certain expert testimony. Points of error seven and eight appear to challenge the sufficiency of the evidence to support the jury's apportionment of negligence between the parties.

The City of Denton bases its appeal on thirteen points of error. Point of error one asserts that the Texas Tort Claims Act does not provide for waiver of immunity under the circumstances of the present case. Point of error two contends that the City of Denton owed no legal duty to appellees. Points of error three through ten contend that there was either no evidence or insufficient evidence to support the jury's findings in answer to Special Issues One, Three, Five, Six and Seven. Points of error eleven, twelve and thirteen complain of the award by the trial court to Ida Louise Page. Because of the complexity of the arguments made concerning the relationship and duties of the parties, and the result this court reaches today, it is necessary to set out the facts of the case in detail.

In April of 1981, Michael Van Page saw a rental listing for a house located in Denton, Denton County, Texas which was situated facing west onto Kendolf Street. To the north of the rent house was a narrow vacant lot, bordered on the north by Lindsey Street and on the west by Kendolf. To the south of the rent house was a large vacant lot, described as a field. About one hundred yards across this field and south of the rent house was a house under construction. Behind the rent house and a bit further north towards Lindsey was a barn or chicken coop. Just behind this barn was the driveway to another house which belonged to the McCarter family. All of the land between the driveway and Kendolf and from Lindsey to the house under construction belonged to Frances Melton including the house under construction and its property.

The rent house was vacant when Michael Page first saw it. It was a small house with a wood exterior. The yard around the house was overgrown and the house itself was in need of painting. The lot which the house sat on was surrounded on three sides by tall shrubs. A note on the door indicated that inquiries about the rent house could be made of R.B. Melton who was at the house under construction on Kendolf. Page went to the house under construction and met R.B. Melton, who indicated to Michael Page that he was acting on behalf of his mother, Frances Melton, in showing the house and attempting to rent it.

R.B. Melton showed Page around the property and pointed out the property lines. He explained to Page that the shrubs around the house marked the property line of the rent house. He told Page that the rent would be three hundred fifty dollars a month. R.B. Melton explained that the barn or chicken coop was used for storage

and was not part of the rental property and would not be included in any rental agreement. There was also an area of the house directly behind the garage which was used for storage and would not be included in the rental agreement. Later that same day, Michael Page, his wife and two children, visited with Frances Melton to discuss the rental of the house. Frances Melton told the Pages basically the same things that R.B. Melton had told Michael Page.

About a week after they visited with Frances Melton, the Pages moved into the house. The next few weeks were spent cleaning up the property surrounding the house. One morning after the yard had been cleaned up, Michael Page found a handwritten note on the front of the house which said, "You finally mowed the yard. When the hell are you going to paint the house?" Michael Page brought this note to the attention of R.B. Melton and they discussed the possibility of painting the house. Page told R.B. Melton that if the paint was furnished he, Page, would paint the house in exchange for rent.

One evening after finding the note, the Pages found both of their cars spray painted with black paint. The Denton Police were contacted and an officer came out and took a report. The next day, Michael Page contacted R.B. Melton about the incident. Following this incident, Frances Melton only charged the Pages three hundred dollars for the May rent. A few days later, the Pages' cars were spray painted again and black and brown paint was splattered on the front of the house. The incidents of vandalism continued and the Pages kept both Frances and R.B. Melton informed about the occurrences. The house was vandalized several times and signs saying "paint me" were painted on the walls. Some obscenities were painted on the front door which had been removed from its hinges in order to refinish the floor of the house.

The Denton Police were contacted three or four times about the vandalism and each time a report was taken by an officer.

These acts of vandalism took place from May of 1981 through September of 1981. It is unclear exactly how many incidents actually occurred and how they were spaced out over this time.

On the evening of September 30, 1981, the Pages were at home when they received a phone call from their neighbor living behind the barn, Bill McCarter. The call came around 9:00 p.m. and Bill McCarter informed Michael Page that the barn was on fire and that he, McCarter, had already called the fire department. The barn could be clearly seen from the McCarters' house but, the shrubs surrounding the rental house obscured the view of the barn from the Pages' house. The fire station is located very close to the Melton property and in a very short time the fire trucks arrived.

The barn had two entrances. One entrance was at the west end of the barn and one at the east end. The west door was padlocked and was mainly used for access to the barn. The east door had been nailed closed and was never used. When Michael Page went outside to the barn he could see that the west door was open and smoke was coming out of the barn. When the firemen entered the barn they found an old antique couch on fire. The fire was extinguished and the couch was pulled outside. The smell of kerosene was present on the couch and it appeared the fire had been deliberately set.

The fire department remained on the scene for approximately thirty minutes. The firemen checked the inside and outside of the barn and then left. Frances Melton was notified about the fire and during the day of October 1, she went to the barn. The padlock on the west door was gone. She returned home and got another lock, then went back to the barn and relocked the west door.

Fire Marshall, Robert (Bob) Hagemann, was present during the September 30th fire. He examined the barn and the couch and filed a written report. He concluded that the fire was deliberately set. During the day of October 1, he returned to the

barn to check the damage and search for evidence but none was found.

On the evening of October 1, 1981, around 10:00 p.m., Michael Page was visiting with neighbors across the street when he saw Bill McCarter running down Lindsey Street towards his house. McCarter ran to Page and told him that the barn was on fire again and that the fire department had been called. Page and McCarter ran to the barn and the fire department arrived shortly thereafter. The couch, which had been pulled outside the previous evening, was up against the wall of the barn and on fire. Both the couch and the corner of the barn were burning when the fire department arrived.

The fire was extinguished and the firemen checked the premises, including the inside of the barn for any remaining fire. In order to check inside, the firemen had to pry the west door off of its hinges. After about thirty minutes from the time they had arrived, the firemen left. McCarter returned to his home and Page went back to his house. Later that same evening Michael and Lou Page were sitting on their front porch when they received a phone call sometime between 10:30 p.m. and 11:00 p.m. and it was Bill McCarter saying that the barn was again on fire, and he had again called the fire department.

The firemen arrived and found a fire inside the barn, much more substantial than the previous two. The firemen extinguished this fire and began checking the inside of the barn. Fire Marshall, Bob Hagemann, arrived at some point during the evening and inspected both the inside and outside of the barn. Hagemann questioned some of the neighbors that had gathered and indicated that he would be watching the barn after this.

Frances Melton was notified of the two October 1st fires and on October 2, she came out to inspect the damage. Michael Page walked with Melton out to the barn and went through the barn with her. Melton pointed out items in the barn which she was disappointed at losing; an old box fan and a riding saddle as well as the antique couch were of particular importance to her. Melton left and Page went back to the house. At this point, the west door was still open.

On October 5, 1981, Frances Melton returned with a man she had hired to tow away an old convertible automobile which was parked along the south side of the barn. Michael Page went out to the barn and helped in moving the car. At some point between October 2 and October 15, Michael Page boarded up the west door of the barn.

On October 15, 1981, the Page family was at home. Lou Page was with the children in the front part of the house around 6:00 p.m. when she heard someone yelling. The screams came from the backyard in the direction of the barn. Lou Page was standing in the living room when Michael Page entered through the backdoor and came into the room. Michael was badly burned on his face, arms, hands and legs. Lou Page immediately called an ambulance. The barn was in flames.

Fire Marshall Bob Hagemann arrived at the barn around 6:20 p.m. on October 15. The fire had already been extinguished by this time. He found some empty five gallon cans scattered throughout the inside of the barn. He further found some unopened five gallon cans, containing gasoline, inside the barn and some cans standing outside of the barn. A matchbook was found laying just inside the west door of the barn. The smell of gasoline could clearly be detected in and around the barn.

Appellees' second amended petition states a cause of action against both Frances Melton and the City of Denton for the personal injuries received by Michael Page and for the mental anguish, loss of consortium and loss of household services suffered by Lou Page. Their second amended petition enumerated six specific acts of negligence attributable to the City of Denton and five specific acts of negligence attributable to Frances Melton which were alleged to be the proximate cause of the injuries and damages suffered by appellees.

The appellees alleged that the City of Denton was negligent in: failing to have the cans of gasoline removed from the barn; failing to enforce the laws of the City of Denton and the State of Texas; failing to warn appellees of the dangerous condition of the barn; failing to insure that the barn was adequately secured against intrusion; failing to inspect the barn so as to determine the presence of gasoline; and failing to have adequate procedures established for the purpose of prevention of future fires. They alleged that Frances Melton was negligent in: violating the ordinances of the City of Denton; violating the laws of the State of Texas; failing to warn the appellees of the dangerous condition of the barn; failing to adequately secure the barn against intrusion; and failing to inspect the barn so as to determine the presence of gasoline. The appellees' second amended petition further pled that "the liability sought to be established against the City of Denton, Texas arises from the condition or use of the storage house in question and that the Defendant Denton's liability is therefore founded upon Article 6252–19, Sec. 3."

At trial, the appellees abandoned all pleadings which alleged that Frances Melton and the City of Denton were respectively negligent in violating and failing to enforce the ordinances and laws of the City of Denton and the State of Texas. The evidence and testimony admitted at trial wholly failed to establish or prove any violation of or failure to enforce such ordinances and laws. The appellees, in this respect, failed to establish the existence of any negligence per se on the part of appellants and any recovery must be based on common law theories of negligence.

Following abandonment of the pleadings above, appellees proceeded on the alleged negligence of both appellants in: failing to warn of the dangerous conditions of the barn; failing to adequately secure the barn against intrusion; and failure to inspect the barn so as to determine the existence of gasoline. Appellees further proceeded against the City of Denton on its alleged negligence in: failing to have the cans of gasoline removed from the barn; and failing to have adequate procedures established for the purpose of prevention of further fires.

Appellant, the City of Denton, concedes that the establishment of a fire department and the furnishing of fire protection is in fact a governmental function. Further, the City of Denton properly asserts that any liability as to it must be predicated upon the terms and provision of the Texas Tort Claims Act, TEX.REV.CIV.STAT.ANN. art. 6252–19 (Vernon 1970), as amended by ch. 50, sec. 1, 1973 Tex.Gen.Laws 77.

■ Appellees pled that the liability of the City of Denton was based upon the "condition or use" of the barn. We find that appellees have failed to either adequately plead or offer sufficient proof of the City of Denton's liability based upon a "use of tangible property". Appellees' petition alleged that the City of Denton was negligent in: failing to have the cans of gasoline removed from the barn; failing to warn the appellees of the dangerous condition of the barn; failing to insure that the barn was adequately secured against intrusion; and failing to inspect the barn so as to determine the presence of gasoline. All of these allegations support a theory of negligence based on the maintenance of a dangerous condition of tangible real property. We find that appellees' petition adequately pled a waiver of immunity under the Texas Tort Claims Act based on a "condition" of tangible real property.

■ Appellees' petition also alleged that the City of Denton was "negligent in failing to have adequate procedures established for the purpose of prevention of future fires in connection with the fire investigation." We find that such pleadings fail to establish the existence of a waiver of immunity under the Texas Tort Claims Act. Section 14(9) of the Act clearly states that "[t]he provision of this Act shall not apply to: ... [a]ny claim based on an injury or death connected with any act or ommission ... arising out of the failure to provide, or the method of providing, police or fire pro-

tection." TEX.REV.CIV.STAT.ANN. art. 6252–19, sec. 14(9) (Vernon 1970). We find that the matter of whether or not to establish procedures for the purpose of prevention of fires is purely a policy decision. As stated by the Supreme Court of Texas in *State v. Terrell,* 588 S.W.2d 784, 788 (Tex. 1979), "if the negligence causing an injury lies in the formulating of policy ... the government remains immune from liability." As such pleadings failed to establish a valid cause of action against the appellant, City of Denton, they will not be considered in the determination to be made in the present appeal.

We now turn to address the appellants' points of error. As mentioned above, appellant, Frances Melton, has submitted a pro se brief in the present appeal. Her points of error will be addressed contemporaneously with those of appellant, the City of Denton, in as far as they deal with the same general subject matter. For purposes of brevity, appellants will hereinafter be referred to by their names as Melton or Denton.

In its first point of error, Denton contends that the court erred in rendering judgment against it in that the Texas Tort Claims Act does not permit recovery against a municipality for premises liability where the municipality was neither the owner, occupier nor user of the property. Denton urges that the Texas Tort Claims Act (hereinafter referred to as the Act) does not provide for recovery except where the governmental unit either: 1) negligently furnishes or uses some item of tangible property; or 2) is the owner, occupier or furnisher of some defective property. In furtherance of this point, Denton asserts that appellees neither pled nor proved any negligent furnishing or use of tangible property. Denton asserts that in order for the appellees to recover under a cause of action based on a defective condition of property that the language of the Act requires appellees to plead and prove that Denton owned, occupied or furnished the allegedly defective property. It is further asserted that even if Denton had been found to be an occupier or owner of the premises, then because this is a premises defect case Denton only owed appellees the duty owed by private persons to a licensee on private property. We do not agree with either Denton's contentions or their construction of the Texas Tort Claims Act.

This is not a "premises defect" case. Appellees neither pled nor attempted to prove that Michael Page's injuries were caused by a defect in the premises. Appellees pled and attempted to prove that their damages were caused by a dangerous and unsafe "condition" of real property which was created and maintained by the negligence of appellants. Section 3 of the Act, establishes the statutory waiver of immunity for political subdivisions. This section provides a waiver of governmental immunity in three general areas: use of publicly owned vehicles, premise defects, and injuries arising from conditions or use of property. *Salcedo v. El Paso Hospital District,* 659 S.W.2d 30, 31 (Tex.1983). It is clear that a cause of action based on a "premise defect" is unquestionably distinguishable from a cause of action based on a "condition" of property.

The Supreme Court of Texas in *Lowe v. Texas Tech University,* 540 S.W.2d 297, 299 (Tex.1976), paraphrased the pertinent portion of sec. 3 of the Act as follows:

> Each unit of government in the state shall be liable for money damages for death or personal injuries *so caused* (i.e., when proximately caused by the negligence or wrongful act or omission of any officer or employee acting within the scope of his employment or office) from some condition or some use of tangible property under circumstances where there would be private liability.

The Supreme Court of Texas in construing the Act has further held that if a government officer or employee acts negligently in carrying out a government policy, then liability may exist under the Act. *State v. Terrell,* 588 S.W.2d at 788.

Appellant, Denton, cannot seriously challenge the propriety of a cause of action based on injuries suffered due to the exist-

ence of a dangerous or unsafe condition of property. The court in *City of Baytown v. Townsend,* 548 S.W.2d 935 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.), upheld an award to plaintiff for injuries suffered due to a dangerous and unsafe condition of property which condition was due to the City's negligence. Further, the property complained of was located on land owned by a school district and not the City. *City of Baytown,* 548 S.W.2d at 938. In *City of Austin v. Cooksey,* 561 S.W.2d 874 (Tex.Civ.App.—Eastland), *aff'd in part, reversed and remanded for entry of corrected judgment,* 570 S.W.2d 386 (Tex.1978), the court upheld a judgment against both the City and the State for the wrongful death of plaintiff's husband. Plaintiff's cause of action was based on "special defects" and "some condition or some use of tangible property, real or personal" theories of recovery. *City of Austin v. Cooksey,* 561 S.W.2d at 877. The Supreme Court of Texas agreed with the Court of Civil Appeals that there was "evidence to support the judgment of liability against the City and State." *City of Austin v. Cooksey,* 570 S.W.2d at 387.

In *Salcedo,* the Supreme court of Texas held that "[t]he words 'some condition' require an allegation of defective or inadequate property when 'some condition' of property is a contributing factor to the injury." *Salcedo,* 659 S.W.2d at 32. The Court in *Salcedo,* however, was determining the proper construction of the Act when "some condition or some use" of tangible "personal" property was a contributing factor to the injury. Under such circumstances, it would surely be necessary to allege the defective or inadequate nature of the personal property which led to its unsafe condition. This is not, however, the case we have before us. The "condition" of property being complained of in the present case is a condition of real property not personal. We find that the present case is therefore, distinguishable from *Salcedo.* We find that appellees adequately pled a good cause of action by alleging that an unsafe and dangerous "condition" of

real property was a contributing factor to Michael Page's injuries.

■ The City of Denton would have us construe the Act in such a way that the property, the "condition" of which has contributed to the plaintiff's injuries, must be owned, occupied, furnished or in some manner controlled by the government unit. We cannot agree with such an interpretation of the Act. The Act clearly states that liability will exist where personal injuries have been caused by "some condition or some use of tangible property, real or personal, under circumstances where such unit of government, if a private person, would be liable to the claimant in accordance with the law of this state." TEX.REV.CIV. STAT.ANN. art. 6252–19, sec. 3 (Vernon 1970), as amended by ch. 50, sec. 1, 1973 Tex.Gen.Laws 77.

The Act does not require as a prerequisite to finding liability that the government unit own, occupy, or in any way control the property. To require such, would violate the legislative mandate contained in the Act itself that the Act be liberally construed. TEX.REV.CIV.STAT.ANN. art. 6252–19, sec. 13 (Vernon 1970). As noted above, the Act provides specifically that the unit of government will be liable under circumstances where "a private person, would be liable to the claimant in accordance with the law of this state." Appellees alleged that Denton was negligent in failing to inspect the barn so as to determine its dangerous condition, failing to warn of such dangerous condition and failing to correct such dangerous condition.

Appellees' theory of liability has support in *Gundolf v. Massman-Johnson,* 473 S.W.2d 70 (Tex.Civ.App.—Beaumont), *error ref'd n.r.e.,* 484 S.W.2d 555 (Tex.1972), where private persons (the defendants) were held liable for their negligence in failing to correct a dangerous condition, which caused the plaintiff's injuries, once such defendants promised the plaintiff to undertake the correction of the dangerous condition and plaintiff relied on such promise. Further, in *Strakos v. Gehring,* 360 S.W.2d 787 (Tex.1962), two defendants

were held liable; one for actively creating a dangerous condition, which resulted in the plaintiffs injuries, and the other for failing to correct such dangerous condition.

We hold, therefore, that if Denton's negligence in failing to correct a dangerous condition resulted in the maintenance of such condition and where. the dangerous condition contributed to appellee's injuries, statutory liability may exist if a "private person" would have been liable. We further hold that where a cause of action based on "some condition" of real property has been adequately pled, government liability may exist to the extent a "private person" would be liable even though such unit of government is neither the owner, occupier nor furnisher of the real property. We find that appellees have adequately pled such a cause of action based on a "condition" of real property, the barn. Since this is a "condition" of property case and not a "premise defect" case, we hold that the exclusion contained in TEX.REV. CIV.STAT.ANN. art. 6252–19, sec. 18(b) (Vernon 1970), is not applicable to the present case. We overrule Denton's point of error one.

Denton's point of error nine contends that the court erred in rendering judgment against it because as a matter of law, Michael Page was not an invitee on the premises in question. Point of error ten contends that the jury's finding that Michael Page was an invitee was against the great weight and preponderance of the evidence. These points of error attack the legal and factual sufficiency of the evidence to support the jury's answer to Special Issue No. 1. Melton's point of error one contends that the trial court erred in denying her motion for directed verdict and for judgment non obstante veredicto in that Michael Page could not have been an invitee. We will construe this point of error as also being a challenge to both the legal and factual sufficiency of the evidence.

Special Issue No. 1 in the court's charge to the jury stated:

Find from a preponderance of the evidence whether on the occasion in question Michael Van Page was (1) a trespasser, or (2) a licensee or (3) an invitee on the "chicken coop" part of Frances Melton's premises?

"TRESPASSER" means a person who is on the property of another without any right, lawful authority, or express or implied invitation, permission or license, not in the performance of any duty to the owner or person in charge or on any business of such person, but merely for his own purposes, pleasure, or convenience, or out of curiosity, and without any enticement, allurement, inducement, or express or implied assurance of safety from the owner or person in charge.

"LICENSEE" means a person who is on the premises with the permission of the possessor but without an express or implied invitation. Such person is on the premises only because the possessor has allowed such person to enter and not because of any business or contractual relations with, or enticement, allurement, or inducement to enter by, the possessor.

"INVITEE" means a person who is on the premises with the express or implied invitation of the owner when he had present business relations with the owner of the premises which would render his presence of mutual aid to both. In the absence of some relation inuring to the mutual benefit of both or to the benefit of the owner, he is not a [sic] invitee. A person who is an invitee cannot be a licensee or a trespasser at the same time.

You are instructed that an implied invitation is one which is extended by reason of the owner of premises doing something or permitting something to be done which fairly indicates to the person entering that his entry is consistent with . the intentions and purposes of the owner.

The jury answered that Michael Page was an "invitee" on the portion of Frances Melton's property in question.

■ The definitions given in the present case are substantially the same as those found in *Rowland v. City of Corpus Christi*, 620 S.W.2d 930, 933 (Tex.Civ.App.

—Corpus Christi 1981, writ ref'd n.r.e.), where the court stated:

> In determining whether a person is an invitee, the general test is whether the injured person at the time of the injury has present business relations with the owner of the premises which would render his presence of mutual aid to both. In determining whether a person is a licensee, the general test is whether his presence on the premises was for his own convenience, or on business with someone other than the owner of the premises. In the absence of some relation which inures to the mutual benefit of the two, or to that of the owner, no invitation can be implied and the injured person must be regarded as a mere licensee.

Appellant, Denton, contends that the phrase "present business relations" in the above definition is all important to the existence of an invitee. We do not agree with such a contention.

The court in *Atchison, Topeka and Santa Fe Railway Co. v. Smith*, 563 S.W.2d 660, 666 (Tex.Civ.App.—Waco 1978, writ ref'd n.r.e.), stated that an invitee is "a person who goes on the premises of another in answer to the express or implied invitation of the owner or occupant [on] the business of the owner or occupant or for their mutual advantage." *Id.* at 666. Citing: 65 C.J.S. *Negligence*, sec. 63(41) (1966). *See Texas Power & Light Company v. Holder*, 385 S.W.2d 873, 885 (Tex.Civ. App.—Tyler), *writ ref'd n.r.e.*, 393 S.W.2d 821 (Tex.1965). Stated much more simply an invitee is "one who enters on another's land with the owner's knowledge and for the mutual benefit of both." *Rosas v. Buddies Food Store*, 518 S.W.2d 534, 536 (Tex.1975). As stated by the court in *Rowland*, however, "[i]n the absence of some relation which inures to the mutual benefit of the two, or to that of the owner, no invitation can be implied...." *Rowland*, 620 S.W.2d at 933.

In the present case, Michael Page's status as either a trespasser, licensee or invitee was vigorously contested by the parties. There was conflicting testimony given by both Michael Page and Melton on this issue. Because the evidence was in conflict, Michael Page's status became a question of fact to be passed upon by the jury. *United Super Markets v. Valesco*, 416 S.W.2d 467, 470 (Tex.Civ.App.—Amarillo 1967, writ ref'd n.r.e.). If the evidence is sufficient to show that Michael Page entered Melton's premises following her extension to him of either an express or implied invitation to do so and that such entry was either on the business of Melton or for the parties' mutual benefit, then appellants' points of error must be overruled. As stated previously, the appellants challenge both the legal and factual sufficiency of the evidence to support the jury's finding that Michael Page was an invitee.

■ In determining a "no evidence" point, we are to consider only the evidence and inferences which tend to support the finding of the jury and disregard all evidences and inferences to the contrary. *See Stodghill v. Texas Employers Insurance Ass'n.*, 582 S.W.2d 102, 103 (Tex.1979); *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951). If there is any evidence of probative force to support the finding of the jury, the point must be overruled and the finding upheld. *In re King's Estate*, 244 S.W.2d at 661–62.

■ Where the challenge to a jury finding is framed as an "insufficient evidence" point, we are to consider all the evidence in the case, both that in support of and that contrary to the finding, to determine if the challenged finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). If the court so determines, the finding should be set aside and a new trial ordered. *Id.*

■ In considering an "insufficient evidence" point, we must remain cognizant of the fact that it is for the jury, as the trier of fact, to judge the credibility of the witnesses, to assign the weight to be given their testimony, and to resolve any con-

flicts or inconsistencies in the testimony. *Taylor v. Lewis*, 553 S.W.2d 153, 161 (Tex. Civ.App.—Amarillo 1977, writ ref'd n.r.e.). This court may not substitute its judgment for that of the jury if the challenged finding is supported by some evidence of probative value and is not against the great weight and preponderance of the evidence. *Alford, Meroney & Co. v. Rowe*, 619 S.W.2d 210, 213 (Tex.Civ.App.—Amarillo 1981, writ ref'd n.r.e.).

■ The jury had before it conflicting testimony from the appellees and Melton. The testimony of both parties stated that no written lease contract existed between the parties and that their oral agreement specifically excluded the barn from the leased premises. The testimony of neither appellee revealed the existence of an "express" invitation by Melton to enter the barn on the evening of October 15, 1981. The definition of an invitee, however, allows that such entrance on the premise may be predicated on either an express or an implied invitation.

The court's charge to the jury defined an "implied" invitation as "one which is extended by reason of the owner of premises doing something or permitting something to be done which fairly indicates to the person entering that his entry is consistent with the intentions and purposes of the owner." It is well-settled, however, that "[a] person may be an invitee as to certain parts of the premises but not as to others." *Burton Construction & Shipbuilding Co. v. Broussard*, 154 Tex. 50, 273 S.W.2d 598, 602 (1954). In order to sustain the jury finding that Michael Page was an invitee, the evidence must be sufficient to: (1) support the existence of an implied invitation extended by Melton to Michael Page, that he help in protecting her property; and (2) support a finding that such implied invitation extended to the inside of the barn. Further, such finding must not be against the great weight and preponderance of the evidence.

At trial, Michael and Lou Page testified that they were given permission to use the lot to the north of the rent house for gardening purposes and the area to the east of the rent house and south of the barn for extra parking space. They also testified that the field to the south of the barn and the rent house could be used for recreation. The appellees' testimony, in effect, revealed that Melton, through her own representations or those of her son, R.B. Melton, acting as her agent, had consented to the Pages' use of almost all of the property surrounding the barn. Michael Page testified that on October 2, the day following the second and third fires, he walked through the barn with Melton. At that time, she indicated that certain of the damaged items inside the barn were a great loss to her. Michael Page testified that he offered to salvage and restore, for her, one particular item and Melton seemed pleased by this idea. Michael Page, by his testimony, offered to nail the west door securely shut but Melton responded that he should wait until a representative saw the barn. Eventually, Michael Page did nail the door shut and told Melton of his actions. Around October 5, Melton came to tow an old car away from the south side of the barn. Michael Page testified that Melton requested that he help in this endeavor, with which request he complied. Finally, Michael Page testified that through Melton's actions and representations he believed that she wanted him to help in protecting and preserving her property. Even further, he believed that he had Melton's permission to look after and protect the barn and to do anything that was necessary to protect her property including entering the barn.

■ Based on the above testimony by appellees, we find that there was some evidence, more than a scintilla, on which the jury could find that Melton extended an implied invitation to Michael Page to help her protect her property. We overrule Denton's point of error nine and so much of Melton's point of error one as contends that there is no evidence to support a finding that Michael Page was an invitee.

In contrast to the testimony offered by appellees, Melton testified that the rental

agreement did not allow for their use of any of the area surrounding the barn. Her testimony revealed, however, that she never told appellees to stay off the property surrounding the barn. Melton testified that there were items of property in the barn which were valuable and many of which had sentimental value to her. She further testified, however, that when Michael Page offered to watch the barn that she told him, "No, I don't want you to. There's nothing in there worth saving now." Yet she admitted that following the October 15th fire she prepared a list, for inventory purposes, of the major items of value which had been in the barn. Later, on cross-examination, in a non-responsive answer, she admitted contacting her insurance company following each of the fires. Michael Page, on cross-examination by counsel for Melton, affirmed counsel's statement that Melton told him not to nail the barn shut because "a representative of her insurance company" was going to come out and look at the barn. Such actions, taken by Melton, are totally inconsistent with her statement to Michael Page that there was nothing of value in the barn.

Melton denied asking Michael Page to help in moving the old car which was towed away around October 5th. In response to a question concerning Michael Page's offer to nail shut the west door, she stated, "I didn't tell him not to nail it up." Such a statement could easily be construed as an admission that she acquiesced in such actions. According to Melton's testimony, she expected appellees to contact the proper authorities in the event her property was vandalized.

Melton testified that in 1979, a fire had been set inside the barn by children in the area. Bill McCarter testified that following this fire in 1979, Melton asked him to watch the barn for her and in fact gave him a key to the lock on the barn. Melton testified that Michael Page offered to watch her property for her and offered to watch the house under construction on Kendolf Street. She testified that her response to such offer was, "No, I don't want you to. I have neighbors across the street who are watching that, and then there's another man also."

Although contrary to her alleged response, we find that the evidence was sufficient to support a finding by the jury that an implied invitation was extended by Melton to Michael Page in the form of a request that he help in watching, protecting and helping to preserve her property, the barn and its contents. We find that such a finding would not be against the great weight and preponderance of the evidence. We find that the evidence was sufficient to support a finding that Michael Page was an invitee on the premises of Melton at the time he received his injuries and that such finding is not against the great weight and preponderance of the evidence.

We must now determine if Michael Page's invitee status extended into the inside of the barn. Michael Page testified that on October 15, he heard a noise out by the barn. He said that he went out to the barn and saw the west door open. He pulled the door back and went inside at which time, there was a flash explosion which knocked him to the ground. Michael Page was, therefore, inside the barn at the time he was injured.

A determination of whether the scope of the implied invitation, extended to Michael Page, included his entry into the barn must depend on whether Melton could reasonably have anticipated such entry in response to the implied invitation to help her protect the barn. *Triangle Motors of Dallas v. Richmond*, 152 Tex. 354, 258 S.W.2d 60, 62 (1953). The invitation to protect Melton's property did not merely cover the barn but the contents of the barn as well. Two fires had previously been set inside the barn. Under such circumstances, it would not be unreasonable for Melton to expect Michael Page to enter the barn in an attempt to catch the arsonist.

We find that the evidence was sufficient to support a finding that the scope of Michael Page's invitee status included his entry into the barn. Such a finding would not be against the great weight and pre-

ponderance of the evidence. We find that the evidence was sufficient to support a finding that Michael Page was an invitee as to the entire premises inside of and surrounding the barn at the time he received his injuries and that such finding is not against the great weight and preponderance of the evidence. We overrule Denton's point of error ten and Melton's point of error one.

Melton's point of error six contends that the trial court erred in treating storage of gasoline in sealed metal cans as an inherently dangerous condition of property that can sustain a finding of negligence and give rise to a duty to inspect, a duty to warn, or a duty to secure the premises. We will construe this point of error as a challenge to the existence of a duty owed to appellees. Denton's point of error two contends that the court erred in rendering judgment against them in that as a matter of law the City had no legal duty toward the appellees.

 It is well-settled that an occupier of land owes a duty of "reasonable care" to his invitees. *Rosas*, 518 S.W.2d at 536. In defining this duty, the Supreme Court of Texas has adopted the Restatement (Second) of Torts sec. 343 (1965):

> A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger.

*See Rosas*, 518 S.W.2d at 536; and *Adam Dante Corporation v. Sharpe*, 483 S.W.2d 452, 454 (1972). It has been held that "the occupier of premises holds a duty to use ordinary care to keep his premises in a reasonably safe condition for his invitees, or to warn of the hazard." *J. Weingarten,*

*Inc. v. Razey,* 426 S.W.2d 538, 539 (Tex. 1968). It has further been held that "[t]he owner is charged with knowledge of any dangerous condition that a reasonable inspection would have revealed because his duty to keep his premises in a reasonably safe condition for use by his invitees includes a duty to inspect." *Robert E. McKee, General Contractor v. Patterson,* 153 Tex. 517, 271 S.W.2d 391, 395 (1954). *See Adam Dante Corporation,* 483 S.W.2d at 455; and *Seideneck v. Cal Bayreuther Associates,* 451 S.W.2d 752, 754 (Tex.1970).

 We have upheld the jury's finding that Michael Page was an invitee on the premises of Melton. We find that Melton had a basic duty to exercise ordinary care to keep her premises in a reasonably safe condition for such an invitee. *Seideneck,* 451 S.W.2d at 754. We further find that such duty included a duty to inspect and a duty to warn the invitee of any dangerous or hazardous condition existing on her premises. We do not, however, find the duty owed to an invitee under the facts of this case includes a duty to secure the premises. *See Nixon v. Mr. Property Management Co., Inc.,* 675 S.W.2d 585 (Tex.App.—Dallas 1984, writ granted). Whether or not it is negligence for an owner or occupier of land to fail to secure its premises from vandalism and intrusion is a question of fact, which might be relevant in attempting to show causation for injuries incurred by a plaintiff. In the present case, the issue of Melton's negligence in failing to secure the barn was submitted to the jury as a question of fact, and the jury found against Melton, and that such negligence was a proximate cause of appellees' injuries. Appellees did not, however, contend that appellants owed them a duty to secure and we find the answer to that special issue does not create such a duty. However, based on our finding that Melton owed appellees a duty to inspect the barn and warn of any dangerous or hazardous condition existing in the barn, we, nevertheless, overrule Melton's point of error six.

Denton properly points out that "any plaintiff must prove the existence and violation of a legal duty owed to him by the defendant to establish tort liability." *Abalos v. Oil Development Company of Texas*, 544 S.W.2d 627, 631 (Tex.1976). In furtherance of this contention, Denton attempts to set itself out as a mere bystander. Denton argues that any duty which may have been owed was merely the duty owed to a licensee pursuant to sec. 18(b) of the Act. We disagree.

We have upheld the jury finding that Michael Page was an invitee on the premises of Melton. Section 3 of the Act states that liability will exist "under circumstances where such unit of government, *if a private person*, would be liable to the claimant in accordance with the law of this state." TEX.REV.CIV.STAT.ANN. art. 6252–19, sec. 3 (Vernon 1970), as amended by ch. 50, sec. 1, 1973 Tex.Gen.Laws 77. (Emphasis added.) We have also previously found that sec. 18(b) of the Act (premises defects) does not apply to this cause of action. Assuming the City of Denton were a private person, we must determine whether or not it would owe a legal duty to the appellees under the circumstances of the present case.

Appellees' cause of action against Denton is based on a theory of vicarious liability. Appellees pled and attempted to prove that the negligence of an individual, Bob Hagemann, Fire Marshall of the City of Denton, was a proximate cause of their damages. There were no allegations that the fires were negligently extinguished or that the Fire Department failed to respond promptly to the fires. Any legal duty owed to appellees must be predicated upon the actions and responsibilities of the Fire Marshall, Bob Hagemann, in acting in his capacity for the City of Denton. We must determine whether Bob Hagemann, if he had been acting as a private person, would have owed a duty to Page, and therefore been liable for the negligent performance of that duty.

If Denton owed a duty to appellees, such duty would arise out of the relationship existing between Melton and the City of Denton. Melton was undisputably the owner and occupier of the premises. The Fire Department of the City of Denton entered the premises to perform a function, the extinguishment and control of fires. Directly connected with this function were the responsibilities and duties delegated to its employee, Fire Marshall Bob Hagemann. Hagemann's deposition testimony states that "[t]he City charters the Fire Marshall to prevent fires in the City of Denton, and you can do that three ways, through three vehicles, which is prevention, inspection, investigation and education." In the same deposition testimony, Hagemann later stated that "[t]he Fire Department is divided up into two sections, or three sections: Prevention, which is mine. I'm over that. I have two employees. I supervise their work." By Hagemann's own testimony, his duties and responsibilities included the prevention of fires.

In general, we believe that the duties and responsibilities performed by Hagemann were for the health and safety of all of the citizens of the City of Denton. In the immediate context of the present case, Hagemann was acting to prevent future fires in Melton's barn. It can fairly be said that Hagemann undertook the job of preventing fires in Melton's barn. He performed this job through the activities of inspection and investigation. A close analogy can be made between the relationship of the Fire Department (through Hagemann) to Melton and that of an independent contractor to an owner or occupier of land.

 It is well-settled that an independent contractor owes the same duty of care to invitees as the owner or occupier of premises themselves would owe to such invitees. *Thomas v. Oil & Gas Building, Inc.*, 582 S.W.2d 873, 879 (Tex.Civ.App.— Corpus Christi 1979, writ ref'd n.r.e.). We perceive no appreciable difference between the duty owed and the job to be performed by Hagemann on Melton's premises and that which an independent contractor engaged to repair such premises would owe to an invitee later using the same. Be-

cause the Fire Department and Hagemann were actively engaging in the performance of their duties and responsibilities while on Melton's premises, we find that they did not occupy the position of an innocent bystander. We find that Denton, acting through its employee Hagemann, owed the same duty of care to Melton's invitee, Michael Page, as Melton (a private person) herself owed. We overrule Denton's point of error two.

Denton's points of error five and seven contend there was no evidence to support the jury's affirmative answer to Special Issues No. 3 and 6 respectively. Points of error six and eight contend that such answers were against the great weight and preponderance of the evidence. Special Issue No. 3 asked: "Do you find that Fire Marshall Bob Hageman [sic] knew, or in the exercise of ordinary care should have known that such gasoline was being stored there?" The jury answered "Yes". The jury answered "Yes" also to Special Issue No. 6 asking: "Do you find that Fire Marshall Bob Hagemann was negligent in failing to inspect the storage house in such a manner as to determine if its condition was dangerous?"

We have found that Denton owed the same duty of care to Michael Page as that owed by Melton. Melton had a duty to inspect for unreasonably dangerous conditions existing in the barn and to warn her invitee of the hazards. In reviewing the evidence we find Hagemann entered Melton's premises for the specific purpose of inspecting the premises and investigating the fires in order to prevent future fires. The very nature of the job to be performed by Hagemann gave rise to a duty to inspect the barn and to either correct or warn of any hazardous or unreasonably dangerous condition existing in the barn.

Hagemann's testimony, reveals that he was interested in finding a can or container which might have held the kerosene used to start the fire on September 30. His deposition testimony states he entered the barn, following the September 30th fire, and looked around. At this time, he claims to have noticed paint cans and all kinds of little cans. Yet there is no indication he checked any of these cans for kerosene even though he admitted such cans could have contained combustible liquids. Hagemann further testified that he returned to the barn on the morning of October 1, the day after the first fire. He stated one of the purposes of this visit was to check the area for any discarded containers and further that his search for such cans or containers was important as an attempt to find evidence which could be linked to the fire. On cross-examination, he testified that on the morning of this search for containers, he did not look inside the barn. Later this day two other fires occurred.

Hagemann testified that he next entered the barn following the two fires on October 1. He again inspected the inside of the barn but found no empty containers which may have contained kerosene. Hagemann testified the only area of the barn he inspected was the west end and he never inspected the east end of the barn. He further testified that when he inspected the barn on October 1, he did not look for any kind of combustible liquid because, "[i]t didn't really impress me that much to be— that much important ...." This in spite of the fact that he knew the fires of September 30th and October 1st were set with kerosene and after having searched for some type of can or container, and having seen numerous little cans.

Based on Hagemann's own testimony, we find there was some evidence, more than a scintilla, on which the jury could base their findings that Hagemann knew, or in the exercise of ordinary care should have known, that gasoline was being stored in the barn and he was negligent in failing to inspect and determine the dangerous condition of the barn. We overrule Denton's points of error five and seven.

Hagemann testified that following his inspection of the barn on the night of October 1, he did not re-enter the barn until his inspection following the fire on October 15. Following the last fire on October 1, Hagemann testified he remained nearby,

watching the barn until around 1:00 a.m. He further testified he returned to the neighborhood prior to October 15, in order to talk to some of the neighbors and view the barn. He admitted that it was likely the arsonist would attempt to set the barn on fire again following October 1.

When Hagemann arrived at the barn on October 15, he detected the smell of gasoline in and around the barn. He found five-gallon cans scattered throughout the inside of the barn and some on the outside of the east side of the barn. Those cans that were unopened contained gasoline. There were at least ten of these five-gallon cans found by Hagemann and one picture, admitted as evidence at trial, shows thirteen of these cans. Hagemann testified that during his only two inspections of the inside of the barn on September 30 and October 1, he never saw these cans and the first time he saw the cans was on October 15.

In defense of his failure to find the cans, Hagemann stated that "I would not know what was being stored in that shed unless someone called and complained about it." Yet there had been three fires set in the barn prior to October 15, and at least two of these were set by using kerosene. He had admitted that it was important to him to find a container which held the combustible liquid but, he never searched for such a container inside the barn and he never searched the east end of the barn prior to October 15. Bill McCarter testified that following the very first barn fire in 1979, he expressed to Hagemann his concern about the hazard caused by paint and paint thinner which was stored in the barn and that he reurged these concerns prior to October 15, 1981. McCarter also stated that he urged these concerns to Melton and asked her to remove them.

Hagemann had testified that he never saw the cans prior to October 15. Ann Richardson, another neighbor who lived on Lindsey Street, testified that she walked through the barn on the morning of October 2. She testified that she entered the barn through the east door. While looking through the inside of the barn, she saw several large cans amidst all the other things that were in the barn. She identified one of the cans admitted as evidence at trial as looking like those she saw in the barn on October 2. Hagemann, Melton and another fireman, Charles Myers, all testified that a person could not enter through the east door prior to October 15. Bill McCarter, however, testified that during the fires on October 1, the firemen entered the barn through the east door and that following October 1, the east door was hanging ajar and could be opened.

As stated above, following the fires of October 1st, Hagemann admitted that it was likely that the arsonist would try to set the barn on fire again. Hagemann also testified that: "If I had known there was gasoline in the building, if I had known this prior to October 15 I would probably have had it removed." He further stated, "I would have asked the occupant to remove it, but the point is: It's not as much for the health and safety of the neighborhood as it is when I was afraid the arsonist would find it and use it. Then it would become a hazard to the health and safety of the neighborhood." Unfortunately, this is exactly what occurred on October 15, which occurrence resulted in the injuries sustained by Michael Page.

We find that the evidence was sufficient to support the jury's findings that Hagemann knew, or in the exercise of ordinary care should have known that gasoline was being stored in the barn and that he was negligent in failing to inspect and determine the dangerous condition of the barn. We find that such findings are not against the great weight and preponderance of the evidence. We overrule Denton's points of error six and eight.

Denton's point of error three contends that as a matter of law there was no proximate cause connecting Denton's alleged negligence to the appellee's injuries. Point of error four contends that the jury's findings of proximate cause were against the great weight and preponderance of the evidence. These points of error challenge the

legal and factual sufficiency of the evidence to support the jury's findings in Special Issues Nos. 5 and 7. Melton's point of error two contends that failure to inspect could not be a proximate cause of appellee's injuries, and point of error three contends that failure to warn appellees could not be a proximate cause of appellee's injuries. By point of error four she contends that failure to secure the premises could not be a proximate cause of appellee's injuries. We will construe Melton's points of error as being a challenge to both the legal and factual sufficiency of the evidence to support the jury's findings in Special Issues Nos. 8, 9, 10, 11, 13 and 14.

We have already discussed and upheld the jury's finding in Special Issue No. 3, that Hagemann knew, or in the exercise of ordinary care should have known that gasoline was being stored in the barn. In Special Issue No. 4, the jury found that Hagemann was negligent in failing to warn appellees of the condition of the barn with gasoline being stored there. Denton has not challenged the jury's finding in Special Issue No. 4. Special Issue No. 5, asked: "Do you find that such failure was a proximate cause of the occurrence in question?" The jury answered in the affirmative by stating, "Yes". We have also discussed and upheld the jury's finding in Special Issue No. 6, that Hagemann was negligent in failing to inspect the barn in such a manner as to determine if it's condition was dangerous. Special Issue No. 7 then asked: "Do you find that such failure was a proximate cause of the occurrence in question?" The jury again answered affirmatively by stating, "Yes".

The jury found in Special Issue No. 8 that Melton was negligent in failing to inspect the barn in such a manner as to determine the existence of gasoline being stored there. Special Issue No. 9 asked: "Do you find that such failure was a proximate cause of the occurrence in question?" In answer to Special Issue No. 10, the jury found that Melton was negligent in failing to adequately secure the barn from vandalism and intrusion. Special Issue No. 11 asked: "Do you find that such failure was

a proximate cause of the occurrence in question?" The jury found in Special Issue No. 12 that Melton knew, or in the exercise of ordinary care should have known that such gasoline was stored in the barn and in Special Issue No. 13, it was found that Melton was negligent in failing to warn appellees of the condition of the barn with gasoline being stored there. Special Issue No. 14 asked: "Do you find that such failure was a proximate cause of the occurrence in question?" The jury answered the proximate cause question in Special Issues Nos. 9, 11 and 14 affirmatively by stating, "Yes".

As stated by the Supreme Court of Texas in *McClure v. Allied Stores of Texas, Inc.*, 608 S.W.2d 901, 903 (Tex.1980) (citations omitted):

> Proximate cause includes two essential elements: (1) foreseeability, and (2) cause in fact. Both elements must be present and may be established by direct or circumstantial evidence. Proximate cause cannot be established by mere guess or conjecture, but rather must be proved by evidence of probative force. Foreseeability is satisfied by showing that the actor, as a person of ordinary intelligence, should have anticipated the danger to others by his negligent act. Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred. Where failure to use ordinary care actively aids in producing an injury as a direct and existing cause, it need not be the sole cause, but it must be a concurring cause and such as might reasonably have been contemplated as contributing to the result under the attending circumstances.

Denton's points of error three and four are based on the argument that the evidence to support the element of foreseeability is completely lacking in the present case therefore proximate cause does not exist as a matter of law. Melton also attacks the element of foreseeability. Denton argues that it was not foreseeable that

an arsonist would find the gasoline and use it to set a fire and further that it was not foreseeable that Michael Page would enter the barn just as such a fire was being set. Melton also argues that Page's entry into the barn was unforeseeable. Denton further argues that a person is not bound to anticipate the unlawful conduct of another (the arsonist's).

In order to address this issue of foreseeability, it is necessary to understand all of the surrounding facts and circumstances. More than one act of negligence led to the fire of October 15, and Michael Page's injuries. We have three negligent parties and one arsonist who all contributed to this occurrence. In addition to finding both Denton and Melton negligent, the jury also found Michael Page negligent in entering the barn and that such negligence was also a proximate cause of his injuries. We will begin by first addressing those points of error raised by Melton.

Melton argues that her failure to inspect, failure to warn and failure to secure the premises could not have been a proximate cause of appellee's injuries. We have previously held that Melton owed Michael Page, as an invitee on her premises, a duty to inspect the barn for dangerous conditions and a duty to warn him of any hazards in the barn. None of Melton's points of error directly attack the jury's findings in Special Issues Nos. 8, 10, 12 and 13. As stated above, the jury's answers to those special issues found that Melton was negligent in failing to inspect the barn, in failing to adequately secure the barn, and further that Melton knew or in the exercise of ordinary care should have known gasoline was stored in the barn and that she was negligent in failing to warn appellees of the storage of gasoline in the barn. Melton has failed to complain of these findings and we will not construe any of her points of error as challenging such findings. We do, however, feel compelled to review these findings in addressing the issue of proximate cause.

Melton was under a duty to inspect the barn for the safety of her invitee, Michael Page. There was no evidence admitted at trial that Melton had ever inspected the barn for hazardous conditions. Melton testified that prior to the fires of September 30 and October 1, 1981, she had not been in the barn since 1977. Following the fires of September 30 and October 1, she did enter the barn, but she stated that she did not see the cans containing gasoline and there is no evidence that her purpose in entering the barn on these occasions was to search for hazardous conditions. The evidence was therefore, sufficient for the jury to find that Melton was negligent in failing to inspect the barn in such a manner as to determine the existence of gasoline being stored there.

Melton testified that the east door had been nailed closed and was not accessible and that the west door had always been kept padlocked. She testified that when she went to the barn on October 1, the padlock was gone therefore, she immediately went home, got another padlock, returned to the barn and placed the new lock on the west door. When she viewed the barn on October 2, the west door had been pulled off its hinges. Her testimony, however, fails to reveal any actions taken by her between October 2, and October 15, to secure the barn. The west door apparently remained open until Michael Page nailed it shut. As testified to by Bill McCarter and Ann Richardson, the east door was also accessible from October 2 until the fire of October 15. The evidence was therefore, sufficient to support the jury's finding that Melton was negligent in failing to adequately secure the barn, but we do not view this issue as controlling.

The Supreme Court in *Seideneck* held that in order for an injured invitee-plaintiff to recover it must be shown: "(1) that the owner or occupier created or maintained on the premises some condition involving an unreasonable risk, of harm, and (2) that the plaintiff's injury resulted from his contact with that condition." *Seideneck,* 451 S.W.2d at 754 (citations omitted). It was further held that "an owner or occupier is charged with knowledge of any dangerous

condition that a reasonable inspection would have revealed." *Id.* In setting out the circumstances under which an owner or occupier may be charged with knowledge, the court stated:

A condition presenting an unreasonable risk of harm is defined as one in which there is a sufficient probability of a harmful event occurring that a reasonably prudent person would have foreseen it or some similar event as likely to happen. It follows that an owner or occupier of land can be charged with knowledge and appreciation of a dangerous condition on his premises only if from a reasonable inspection a reasonably prudent person should have foreseen a probability that the condition would result in injury to another. [Citations omitted.]

*Id.* Of course, the objective standard to be applied will depend on the circumstances and facts surrounding each case.

The Supreme Court of Texas in *Robert R. Walker, Inc. v. Burgdorf,* 150 Tex. 603, 244 S.W.2d 506, 509 (1951), stated that "[f]rom those who handle explosives, combustible gases, gasoline, petroleum, electricity, and similar dangerous commodities, the law exacts a duty to protect the public which is proportionate to and commensurate with the dangers involved." Melton has contended that the storage of gasoline in metal containers is an accepted method of storage and therefore, could not be negligence. Hagemann testified that the gasoline was properly stored in these cans.

█ We agree with Melton, that the storage of gasoline in metal containers is acceptable and in fact preferable to lesser forms of containers. Hagemann even testified that storage of gasoline in a metal can would be considered safe storage. We find, however, that whether or not the condition in the barn, created by such storage, presented an unreasonable risk of harm depends on all of the surrounding facts and circumstances. In the present case, there was not just one or two five gallon cans of gasoline stored in the barn. The evidence showed that there was 10 to 13 five gallon cans of gasoline in the barn, as much as 65

gallons of gasoline stored in a barn which had been repeatedly vandalized by a very persistent arsonist. Melton testified that these fires caused her to fear for her home and personal safety and that following October 1, she was concerned that another fire would be set in the barn which concern caused her to have the old car towed away from the barn. Under the circumstances, we find that a harmful event arising from the storage of such a large amount of gasoline was foreseeable. The evidence therefore, was sufficient to support a finding by the jury which charged Melton with knowledge and appreciation of the dangerous condition of the barn.

Melton was under a duty to warn appellees of any hazardous condition that might exist in the barn. Based on the above findings, the evidence was sufficient to support the jury's finding that Melton was negligent in failing to warn the appellees of the hazardous condition of the barn.

We have found that Melton and Denton were properly chargeable with knowledge or appreciation of the dangerous condition of the barn created by the storage of such a large amount of gasoline in the barn. We have upheld the jury's findings that Melton and Denton were negligent in failing to inspect the barn and in failing to warn the appellees of the barn's dangerous condition. It is clear that the negligence of Melton resulted in the creation of a dangerous condition in the barn. The negligence of Denton acted to maintain this condition through Hagemann's failure to discover such dangerous condition. The general rule is that " 'where the negligences of two or more persons concur in producing a single, indivisible injury, then such persons are jointly and severally liable, although there was no common duty, common design, or concerted action.' " *Austin Road Co. v. Pope,* 147 Tex. 430, 216 S.W.2d 563, 565 (1949). In a case where the concurrent negligence of more than one party acts to produce the injury " 'all persons whose acts contributed to the injury are liable therefor, and the negligence of one does not

excuse the negligence of the other.'" *Strakos v. Gehring,* 360 S.W.2d at 794.

In *Clark v. Waggoner,* 452 S.W.2d 437, 439–40 (Tex.1970) (footnote omitted), the Supreme Court stated that:

> The foreseeability element of proximate cause is established by proof that the actor as a person of ordinary intelligence and prudence should have anticipated the danger to others created by his negligent act, and the rule does not require that he anticipate just how injuries will grow out of that dangerous situation.

In the present case, this element of foreseeability must be established for both Melton and Denton. In addition to the negligence of both appellants, however, we have an intervening cause, the unlawful act of an arsonist, which led to appellee's injuries. It must therefore, be determined if such intervening cause was foreseeable.

■ In *Biggers v. Continental Bus System,* 157 Tex. 351, 298 S.W.2d 79, 82 (1956), *rev'd on other grounds,* 157 Tex. 351, 303 S.W.2d 359 (1957), the Supreme Court quoted the rule that " 'a party should not be held responsible for the consequences of an act which ought not reasonably to have been foreseen.'" *See Houston Lighting & Power Company v. Brooks,* 161 Tex. 32, 336 S.W.2d 603 (1960). The Supreme Court further quoted that " '[i]t is well settled that a person is not bound to anticipate negligent or unlawful conduct on the part of another.'" *Biggers,* 298 S.W.2d at 82 (citation omitted). In the present case, however, there had already been three arson fires in the barn and both Melton and Denton admitted that they did in fact foresee the probability that more such fires would occur. Based on such admissions, standing alone, we find that there is some evidence, more than a scintilla, to support the jury's finding that the fire of October 15, and Michael Page's presence in the barn at that time was foreseeable as to both Melton and Denton.

Melton showed a conscious appreciation for the probability of future acts of arson taking place by towing the old car away from the barn. She testified that "I figured that whoever was burning that barn was surely going to burn up that cloth-top convertible." We have previously upheld the finding that Michael Page was an invitee on the premises of Melton and found that his invitee status extended to the inside of the barn. The implied invitation extended to Michael Page was in the form of a request to help protect the barn and its contents. To accomplish this, it would not be unreasonable to anticipate his entrance into the barn in an attempt to catch the arsonist. We find the evidence sufficient to support a finding that Michael Page's presence in the barn, at the same time that an arsonist was setting a fire in such barn, was foreseeable as to Melton and that such finding is not against the great weight and preponderance of the evidence.

Hagemann's testimony shows that he knew that the barn was a possible target of future acts of arson, and he did in fact expect more fires to be set in the barn. He took steps to watch the barn and investigate for possible motives and suspects. He knew that arson fires could be a hazard to the health and safety of the neighborhood. In *Biggers,* the Supreme Court held that "[i]t is not necessary that the defendant should or would reasonably anticipate the very consequences or the exact nature of the plaintiff's injury or the precise manner of its infliction in order that such consequence be foreseeable." *Biggers,* 298 S.W.2d at 82. *See Biggers,* 303 S.W.2d at 365. We find that the evidence is sufficient to support a finding that the fire of October 15 and Michael Page's presence in the barn at the time was foreseeable as to Denton also, and that such a finding is not against the great weight and preponderance of the evidence.

In discussing the second element necessary to support the jury's finding of proximate cause, we note the case of *Missouri Pacific Railroad Company v. American Statesman,* 552 S.W.2d 99, 103 (Tex.1977), where the Supreme Court stated that, "[c]ause in fact as an element of proximate cause means that the negligent act or omission was a substantial factor in bringing

about the injury and without which no harm would have been incurred." In the present case, the immediate cause of appellee's injuries was the fire set by an arsonist. "When the active and immediate cause of the injury is an independent agency, therefore, the first inquiry is whether the intervening cause and its probable consequences were such as could reasonably have been anticipated by the original wrongdoer." *Bell v. Campbell*, 434 S.W.2d 117, 120 (Tex.1968). The question which therefore arises is that: but for the negligence of Melton and Denton would the injuries sustained by Michael Page have occurred?

It is clear that the storage, by Melton, of such a large quantity of gasoline in the barn under the attendant circumstances created a dangerous condition. Both Melton and Denton were found to be negligent for failing to discover the presence of the gasoline in the barn and failing to warn appellees of the dangerous condition of the barn. Melton testified that she would have moved the gasoline if she had known about it. Hagemann testified that if he had known that there was gasoline present in the barn, he would have had it removed. This shows knowledge by both of them of the dangerous condition created by the storage of gasoline.

Michael Page testified that immediately after entering the barn, there was an explosion which knocked him to the ground. He further testified that, "[i]t was like being in a tornado of flames." Hagemann testified that this kind of flash fire is caused when gasoline vapors are ignited. He stated: "The gasoline, the liquid does not burn itself. It's the vapor that the gasoline gives off.... The vapor is what burns, not the liquid itself. So that's where you got your whoosh, the vapors will collect when you ignite it. The ignition will take the vapor in a quick reaction." From such testimony, it is clear that Michael Page's injuries were sustained in a fire accelerated by gasoline vapors. If the gasoline had not been in the barn, the arsonist might still have set a fire, but it

would not have been of the magnitude and intensity that caused Page's injuries. We find that there is some evidence, more than a scintilla, to support the jury's finding that the negligence of Melton and Denton, acting concurrently, were a cause in fact of Michael Page's injuries. We overrule Denton's point of error three and so much of Melton's points of error two, three and four as attacks the legal sufficiency of the evidence to support the jury's findings on the proximate cause issues.

It has been held that "[t]he act of a third person which intervenes and contributes a condition necessary to the injurious effect of the original negligence will not excuse the first wrongdoer if such act ought to have been foreseen." *Clark*, 452 S.W.2d at 440. We have found that the actions of the arsonist in this case were in fact foreseen by both Melton and Denton. The Supreme Court in *Robert R. Walker, Inc.* quoted the rule that:

> If the effects of the actor's negligent conduct actively and continuously operate to bring about harm to another, the fact that the active and substantially simultaneous operation of the effects of a third person's innocent, tortious or criminal act is also a substantial factor in bringing about the harm does not protect the actor from liability.

*Robert R. Walker, Inc.*, 244 S.W.2d at 509.

We hold under the facts of this case that the evidence is sufficient to support the jury's finding that the negligence of Melton and Denton, acting concurrently, were a cause in fact of Michael Page's injuries and that such a finding is not against the great weight and preponderance of the evidence. We find therefore, that the evidence was sufficient to support the jury's findings that such acts of negligence were proximate causes of Michael Page's injuries, being foreseeable consequences and causes in fact of the injuries. We further find that such findings of proximate cause were not against the great weight and preponderance of the evidence. We overrule Melton's points of error two, three and four, and Denton's point of error four.

Melton's point of error five contends that the court erred in excluding the expert opinion testimony of Fire Marshall Hagemann to the effect that Michael Page had set the fire of October 15, 1981, which fire resulted in his injuries. At trial, Hagemann was called as an expert witness for the City of Denton. On direct examination, he was asked if he had an expert opinion as to who set the fire of October 15. Appellees' objected to the admissibility of such opinion testimony which objection was sustained by the trial court. The trial court ruled that such opinion should be excluded pursuant to TEX.R.CIV.P. 168. Melton contends it was error to exclude such testimony.

Prior to trial, appellees submitted interrogatories to both Melton and Denton. Interrogatory no. 2 asked: "State the names of any expert witnesses who will be called to testify in this cause. State also the address and telephone number of each expert and a brief summary of the testimony which will be elicited from the expert." Denton answered this interrogatory by stating "Bob Hagemann and George Dulaney with the City of Denton who will testify the same as can be found in their deposition previously taken in this case." It appears that neither the deposition of Hagemann or Dulaney contained an opinion as to who set the fire of October 15. The trial court therefore found that such opinion was inadmissible under rule 168, as it then existed. The record before this court does not contain an answer to the interrogatories by Melton. It is obvious that the same reason for excluding such an opinion would therefore apply to Melton. The exclusion of such testimony for failure to comply with discovery rules was a matter which lay within the sound discretion of the trial court and such action will not be set aside except upon a showing of a clear abuse of discretion. *See Texas Employers' Insurance Ass'n. v. Meyer,* 620 S.W.2d 179 (Tex. Civ.App.—Waco 1981, no writ).

The trial court, in the present case, excluded such opinion for an additional reason. The court stated that it had determined that the testimony was "extremely prejudiced" and that the relevance of such testimony did not outweigh its prejudicial quality. This proffered opinion was not being expressed by a disinterested expert witness. This was an opinion by the very man, Hagemann, whose negligence formed the basis of appellees' cause of action against Denton. This additional reason supports a finding of lack of abuse in the trial court's sound judgment in excluding the proposed expert opinion.

Outside the presence of the jury, Denton made an offer of Hagemann's opinion, which offer was later tendered as a bill of exceptions. Hagemann testified that: "Through all the investigation and talking to everyone and looking at a lot of things, at the building, the access of the building, my opinion is that Mr. Page had the opportunity to commit the crime of arson, and I feel that he did." He testified that Michael Page showed an interest in having the barn torn down and that as no further fires occurred after his injuries on October 15 therefore, he was very suspicious of Michael Page. He further based his opinion on the conclusion that if gasoline were poured into the barn and a match set to it, then the result would be an instantaneous flash and that whoever struck a match in the barn under such circumstances would have been burned just like Michael Page was.

On direct examination before the jury, Hagemann testified that following the fires of October 1, Michael Page asked him if the barn had been damaged enough to be torn down. This was the same evidence on which Hagemann based his assumption that Michael Page had an interest in seeing the barn torn down. Hagemann testified, before the jury, that he found a matchbook laying approximately three feet inside the west door of the barn. Melton testified that following the fire of October 15, she had no further problems with vandalism of the barn.

On direct examination by counsel for Melton, Hagemann testified before the jury as follows:

Q. Now, if someone went in there, in that barn, and poured five five-gallon cans of gasoline out in the floor, would that be a sufficient quantity of gasoline to emit a large amount of gasoline vapor?

A. Yes, it would.

Q. And in an enclosed area like that would that vapor be more concentrated that [sic] it would be if it was just poured out on the ground in the open air?

A. Yes, it would.

Q. And, in your opinion, sir, if someone lit a spark or lit a match in a barn like that where that gasoline had been poured out would there be any time lag between lighting that match and an explosion?

A. No, it would be instantaneous.

Q. And would anyone who was in the barn when that source of ignition was lighted in your opinion have been burned by the flash fire?

A. That's correct.

Michael Page was the only person in the barn at the time of the fire and he was the only person injured in the fire of October 15. The inference to be drawn from such testimony was therefore, obvious.

All of the circumstantial and physical evidence on which Hagemann had based his opinion was properly before the jury for their consideration. Special Issue No. 17 asked, "Do you find from a preponderance of the evidence that MICHAEL VAN PAGE caused the combustion of the gasoline in question?". The jury answered in the negative by stating, "We do not". We find no abuse of discretion in excluding the expert opinion testimony of Hagemann. We find that the error, if any exists, in excluding such testimony did not amount to such a denial of the rights of Melton as was calculated to cause and probably did cause the rendition of an improper judgment. TEX.R.CIV.P. 434. We find no abuse of discretion on the part of the trial court and overrule Melton's point of error five.

Melton's point of error seven contends that Michael Page assumed the risk according to his own testimony therefore, he should not recover for his injuries. Her point of error eight contends that as Michael Page was negligent in his own independent undertaking, proximately causing his own injuries, he should not recover damages.

In *Farley v. M M Cattle Company*, 529 S.W.2d 751, 758 (Tex.1975), the Supreme Court abolished the defense of voluntary assumption of risk in ordinary negligence cases. *See Abalos*, 544 S.W.2d at 631, n. 2. The Supreme Court in *Farley* stated that henceforth, "the reasonableness of an actor's conduct in confronting a risk will be determined under principles of contributory negligence." *Farley*, 529 S.W.2d at 758; *See Parker v. Highland Park, Inc.*, 565 S.W.2d 512 (Tex.1978). The jury, in the present case, found that the City of Denton was 50% negligent, Melton was 35% negligent and Michael Page was 15% negligent. Michael Page was therefore entitled to recover for his injuries against both Denton and Melton. TEX.REV.CIV.STAT.ANN. art. 2212a (Vernon Supp.1984). We overrule Melton's points of error seven and eight.

Denton's point of error eleven contends that the court erred in rendering judgment in favor of Lou Page for mental anguish for the reason that as a matter of law, she is not entitled to such recovery. Denton argues that for a party to recover for mental anguish the party must prove an intentional tort occurred, direct impact upon the body of the party or that some physical debilitation was suffered as a result of the accident. It is urged that the only exceptions to this rule are the "zone of danger" doctrine or where a party simultaneously observes a fatal injury to a close relative. Denton argues that there exists no evidence of physical debilitation or in the alternative the evidence which does exist was insufficient to support a finding of physical debilitation.

In the present case, Special Issue No. 22 asked: "What sum of money, if paid now in cash, do you find would fairly and reasonably compensate Lou Page for her dam-

ages which you find resulted from the occurrence in question?" Subpart (a) of this special issue covered "Mental anguish in the past". The jury answered this part by stating the amount "$20,000.00."

This court recognizes the rule that in order to recover damages for mental anguish, a party must allege and prove that the wrongful action which caused the suffering was grossly negligent or willful, or that the resulting anguish caused physical damage (injury). *See Luna v. North Star Dodge Sales, Inc.,* 667 S.W.2d 115, 117 (Tex.1984); *Farmers & Merchants State Bank v. Ferguson* 617 S.W.2d 918 (Tex.1981); and *Kaufman v. Miller,* 414 S.W.2d 164 (Tex.1967). We know of no existing Texas authority which holds that a party may recover for mental anguish where there is no showing of physical harm, of some sort, suffered by the party, or without showing that the action of the wrongdoer was willful or grossly negligent.

Appellees, in the present case, neither pled nor offered proof that the actions of Melton and Denton were either grossly negligent or willful. It was therefore, incumbent on appellees to show the existence of some sort of physical harm experienced by Lou Page in order to recover for mental anguish suffered by her. Special Issue No. 22 inquired only as to the monetary amount of damages suffered by Lou Page for her mental anguish in the past. The charge to the jury does not contain any special issues inquiring as to either the existence of mental anguish suffered by Lou Page or the existence of physical harm or physical manifestations flowing from such mental anguish. Denton did not request such special issues and did not object to the omission of such special issues. The only objection raised by Denton to this damage issue states that "as a matter of law there is no cause of action for mental anguish when a family member is injured nonfatally, and the person for whom damages are requested has received no physical injuries themself." Other than having no basis in law, such an

objection was not sufficient to preserve the error which Denton complains of on appeal. Pursuant to TEX.R.CIV.P. 279, it has been held that when the trial court omits "issues necessary to support a ground of recovery, without an objection or request, and there is evidence to support a finding thereon, the trial court will be deemed to have found the issue in such a manner as to support its judgment." *Turner, Collie & Braden, Inc. v. Brookhollow, Inc.,* 642 S.W.2d 160, 165 (Tex.1982). Such a deemed finding need not be supported by a preponderance of the evidence but only by "some evidence". *Id.*

In the present case, Lou Page testified that following her husband's injuries, she had trouble sleeping, she became anxious and tense and she worried about her marital relationship. She described the frustration and distress she felt at the time of Michael's injuries and she described the difficulty the family had while Michael was recovering from his injuries. We find that this is some evidence of mental anguish and resulting physical debilitation suffered by Lou Page flowing therefrom. This is sufficient to support the jury finding and award of damages. We overrule Denton's point of error eleven.

Denton's point of error twelve contends that the court erred in rendering judgment for Lou Page in the amount of $31,375, jointly and severally against appellants for the reason that the total liability of Denton is limited to $100,000. The court rendered judgment for Michael Page in the amount of $100,000, jointly and severally against appellants. Denton argues that Michael Page was the only person injured in the October 15th fire therefore, recovery should be limited to the $100,000 "per person" limitation contained in sec. 3 of the Act. We do not agree with Denton's construction of the Act. Section 3 states that "[l]iability hereunder shall be limited to $100,000 per person and $300,000 for any single occurrence for bodily injury or death." TEX.REV.CIV.STAT.ANN. art. 6252–19 (Vernon 1970), as amended by, ch. 50, sec. 1, 1973 Tex.Gen.Laws 77. In *City*

*of Austin v. Cooksey,* 570 S.W.2d at 388, the Supreme Court held that the term "per person" refers to "the person or persons who sustain injury." In *City of Austin v. Cooksey,* the plaintiffs' claims were based on the wrongful death of the deceased and not on any injury sustained by the plaintiffs themselves.

Lou Page's damages and basis for recovery were predicated on the mental anguish, loss of consortium and loss of services suffered by her. We find that those damages alleged by Lou Page are the type of injury which form the basis of a separate and independent cause of action which injury is compensable under the Act. We overrule Denton's point of error twelve.

Denton's point of error thirteen contends that the court erred in rendering judgment in favor of Lou Page in the amount of $31,375 in that her recovery should be reduced by the comparative negligence of Michael Page. Denton argues that Lou Page's damages are derivative claims based on Michael Page's injuries and therefore should be reduced by his comparative negligence.

The jury awarded Lou Page $20,000 for mental anguish in the past, $7,500 for loss of consortium, and $5,000 for the loss of household services of Michael Page in the past and future. Added together, these awards amount to $32,500, the judgment of the court, however, only awarded Lou Page $31,375. The parties agree that the trial court reduced the award to Lou Page for loss of consortium by the 15% of comparative negligence attributable to Michael Page. Denton now contends that the entire award to Lou Page should have been reduced. Appellees, by a single cross-assignment of error, contend the award for loss of consortium should not have been reduced.

■ In *Whittlesey v. Miller,* 572 S.W.2d 665, 667 (Tex.1978), the Supreme Court stated that a "deprived spouse's suit for loss of consortium is considered to be derivative of the impaired spouse's negligence action to the extent that the tortfeasor's liability to the impaired spouse

must be established." The Supreme Court of Texas has further held that where a deprived spouse's cause of action is derivative of the injured spouse's suit then a defense that tends to constrict or exclude the tortfeasor's liability to the injured spouse will have the same effect on the deprived spouse's cause of action. *Reed Tool Co. v. Copelin,* 610 S.W.2d 736, 738–39 (Tex.1980). Such a rule is not applicable where the suit does not involve a derivative cause of action. *Id.* at 739, n. 2. If the spouse's suit is based on personal injuries sustained by them, then the action is not derivative and the injured spouse's contributory negligence will not act to constrict the other spouse's recovery. *See Southwestern Bell Telephone Co. v. Thomas,* 554 S.W.2d 672 (Tex.1977); and *Graham v. Franco,* 488 S.W.2d 390 (Tex.1972).

■ It is clear that an action for loss of consortium is derivative and therefore the contributory negligence of the injured spouse will constrict the recovery of the deprived spouse. *Reed Tool Co.,* 610 S.W.2d at 738–39. A cause of action for loss of household services is based on the loss of the services of the injured spouse. If the tortfeasor is not liable for the injuries to the spouse, then surely such tortfeasor would not be liable for a loss of household services. We find that a cause of action for loss of household services is derivative and that a recovery for such loss will be constricted by the contributory negligence of an injured spouse.

■ An action for mental anguish is based on mental injuries suffered by a spouse and the physical manifestations flowing from such injury. Mental anguish is an injury separate and apart from that suffered by an injured spouse. It might well be possible that the injured spouse's suit against the tortfeasor could be barred and yet the spouse suffering mental anguish could still recover against such tortfeasor. We find that a cause of action for mental anguish is not derivative and any recovery will not be constricted by the injured spouse's contributory negligence.

We sustain, in part, Denton's point of error thirteen. We overrule appellee's cross-assignment of error.

Lou Page's recovery of $20,000 for mental anguish should not be reduced by Michael Page's contributory negligence. The court below did in fact reduce the award for loss of consortium by 15%. It remains necessary to reduce the award to Lou Page for loss of household services by the 15% negligence attributable to Michael Page. Lou Page was awarded $5,000, for the loss of household services of Michael Page in the past and future. We reduce such award by $750. We reform the judgment of the trial court and award Lou Page $20,000 for mental anguish, $6,375 for loss of consortium and $4,250 for loss of household services. *See Stoner v. Hudgins,* 568 S.W.2d 898 (Tex.Civ.App.—Fort Worth 1978, writ ref'd n.r.e.). We find no matter of fact to be ascertained and that the damage to be assessed and the matter to be decreed is certain. TEX.R.CIV.P. 434. We accordingly enter judgment that Ida Louise Page have and recover of and from appellants, Denton and Melton, jointly and severally, the sum of $30,625.

As reformed, the judgment of the court below is affirmed.